STATE OF MINNESOTA

IN SUPREME COURT

A14-1587

Court of Appeals

Gildea, C.J.
Took no part, Lillehaug, Chutich, JJ.

In the Matter of the Expulsion of A.D. from
United South Central Public Schools No. 2134.

Filed:  August 3, 2016
Office of Appellate Courts

_____

Trevor S. Helmers, Elizabeth J. Vieira, Rupp, Anderson, Squires & Waldspurger, P.A., Minneapolis, Minnesota, for appellant Independent School District No. 2134, United South Central.

Andrea J. Jepsen, Amy J. Goetz, School Law Center, LLC, Saint Paul, Minnesota; and

Nicole M. Moen, Timothy W. Billion, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for respondent A.D.

Neal T. Buethe, Claire V.J. Joseph, Briggs and Morgan, P.A., Minneapolis, Minnesota, for amicus curiae Minnesota Association of School Administrators.

Roger J. Aronson, Minneapolis, Minnesota, for amicus curiae Minnesota Association of Secondary School Principals.

Michelle D. Kenney, Knutson, Flynn & Deans, P.A., Mendota Heights, Minnesota, for amicus curiae Minnesota School Boards Association.

Selene Almazan, Council of Parent Attorneys and Advocates, Towson, Maryland; and

Christopher E. Crutchfield, Saint Paul, Minnesota, for amici curiae Children's Defense Fund, Children's Law Center of Minnesota, Council of Parent Attorneys and Advocates, Council on Crime and Justice, ISAIAH, Legal Rights Center, Mid-Minnesota Legal Aid, Professor Jason P. Nance, Saint Paul Branch of the National Association for the Advancement of Colored People, and Southern Minnesota Regional Legal Services.

_____

1

1.    Under the Pupil Fair Dismissal Act, Minn. Stat. § 121A.45, subd. 2(a) (2014), a school district may dismiss a student for a "willful violation" of a reasonable school policy only if the student deliberately and intentionally violates the policy. Because the school board's decision to expel the student for a "willful violation" of a reasonable school policy was not supported by substantial evidence, the school district did not have statutory authority to expel the student on that basis.

2.    Under the Pupil Fair Dismissal Act, Minn. Stat. § 121A.45, subd. 2(c) (2014), a school district may dismiss a student for "willful conduct that endangers" the student or others. Because the school board's decision to expel the student for "willful conduct that endangers" was not supported by substantial evidence, the school district did not have statutory authority to expel the student on that basis.

Affirmed.

O P I N I O N

GILDEA, Chief Justice.

The questions presented in this case involve the interpretation of the Pupil Fair Dismissal Act, Minn. Stat. §§ 121A.40–.575 (2014) ("Act"), and the Act's application to a school district's weapons policy. The Act provides that a school district may dismiss a student for a "willful violation" of a reasonable school policy or for "willful conduct that

endangers" the student or others.[1]   Minn. Stat. § 121A.45, subd. 2(a), (c).   Appellant

United South Central Independent School District No. 2134 ("District") expelled student

A.D. for 6 weeks after finding a 3-inch pocketknife in a purse in her locker.   The

Commissioner of the Minnesota Department of Education ("Commissioner") affirmed

the expulsion.   The court of appeals reversed the Commissioner's decision, holding that

A.D. did not willfully violate the District's weapons policy when she unwittingly carried

the pocketknife to school, nor did the pocketknife's presence in A.D.'s locker bring the

student or others "into danger or peril of probable harm or loss."   *In re Expulsion of A.D.*,

No. A14-1587, 2015 WL 4393395, at *5-6 (Minn. App. July 20, 2015) (quoting

*Webster's Third New International* Dictionary 748 (3d ed. 1961)).   Because the record

does not support the conclusion that A.D. deliberately and intentionally violated the

District's weapons policy or endangered herself or others, we affirm.

This case arises from a random search for controlled substances at United South

Central High School on Tuesday, April 15, 2014.  During the search, the building was put

on "lockdown" and the students were required to remain in their classrooms.   Officials

used a drug-sniffing police dog to conduct the search and the dog alerted on A.D.'s

locker.   When the school liaison officer searched A.D.'s unlocked locker, he found no

controlled substances.   He did, however, observe a 3-inch folding pocketknife in the side-

---

[1]   The Act also provides for a student's dismissal for "willful conduct that significantly disrupts the rights of others to an education or the ability of school personnel to perform their duties, or school sponsored extracurricular activities."   Minn. Stat. § 121A.45, subd. 2(b).

pocket of a purse that was hanging in A.D.'s locker. The officer secured the pocketknife and informed the principal.

Approximately 2 hours after the search, the officer and the school principal called A.D. into the principal's office. When asked if she knew why she was called to the principal's office, A.D. admitted that she had brought a pocketknife to school. A.D. explained that she used the pocketknife to cut twine on hay bales at her boyfriend's family farm. She had visited the farm during the previous weekend, and while she typically removes the pocketknife from her purse and places it on a table before leaving her home, on that occasion she had forgotten to do so. A.D. told the principal that she "totally forgot" the pocketknife was in her purse until the school announced the lockdown that morning.[2]

The District's weapons policy provides that "[n]o student or nonstudent, including adults and visitors, shall possess, use or distribute a weapon when in a school location." A "weapon" is defined to include all knives and blades. This policy was listed in the school-issued "Agenda Book" and the student handbook, and was discussed during the beginning-of-the-year assembly. Although the record does not reflect how A.D. knew of the weapons policy, A.D. told the principal that she knew it was against school policy to

---

[2]    When asked whether she had brought the purse and knife to school the day before, a Monday, A.D. said she had not. Security camera footage later revealed that A.D. had indeed carried the same purse to school the day before, though A.D. testified at the expulsion hearing that she "had no idea" whether she brought the same purse to school on the day before the search because she "ha[s] so many purses." A.D. did not remember bringing the purse on the previous day until she was shown the camera footage at the expulsion hearing.

4

have a pocketknife at school. A.D. did not alert anyone of her possession of the pocketknife until questioned by the principal. The principal told A.D. that, even though she believed A.D. was fully cooperating with the administration and had "told [the] truth" about forgetting the knife's presence in her purse, the District's weapons policy required the principal to suspend A.D. for at least 3 days. The school issued A.D. a "Notice of Suspension," citing "[w]illful conduct that endangers the student, others, or property of the school,"—namely, "[p]ossession of a knife on school property."[3] Consistent with the District's weapons policy, the principal recommended to the Superintendent that A.D. be expelled for the remainder of the school year.

On April 21, 2014, A.D. and her parents received a "Notice of Proposed Expulsion" from the District, listing all three grounds for expulsion under the Act: (1) a "willful violation of any reasonable school [policy]," (2) "willful conduct that significantly disrupts the rights of others to an education," and (3) "willful conduct that endangers the pupil or other pupils." Minn. Stat. § 121A.45, subd. 2(a)-(c). A.D. requested a hearing under Minn. Stat. § 121A.47, subd. 1, and an expulsion hearing was held on April 24 before the District's school board ("Board"). Following the hearing, the Board issued its findings of fact and conclusions, and expelled A.D. for 6 weeks based on her "willful violation of reasonable School Board regulations, and willful conduct that endangered the Student, other pupils, and surrounding persons."

---

[3]   The Notice of Suspension listed only one ground for the suspension and did not rely on either of the other two grounds provided in the Act. *See* Minn. Stat. § 121A.45, subd. 2(a)-(c) (listing three grounds for dismissal).

A.D. appealed the Board's decision to the Commissioner of Education. *See* Minn. Stat. § 121A.49 (allowing for the appeal of an expulsion decision to the Commissioner of Education). A.D. argued that the Board's decision was unlawful because A.D. did not willfully violate the District's weapons policy, and that the search of A.D.'s locker and purse violated A.D.'s constitutional rights. The Commissioner rejected A.D.'s arguments, ruling that the Board's finding of a willful violation of school policy was supported by substantial evidence. Specifically, the Commissioner determined that A.D. "placed the knife in her purse and brought it to school" and that A.D. "had actual knowledge that having a knife in her purse in her school locker was a violation of the District's weapons policy." The Commissioner also rejected A.D.'s constitutional arguments. After remanding the matter to the Board for further explanation as to the length of the expulsion, the Commissioner affirmed A.D.'s 6-week expulsion on the "willful violation" statutory ground. Minn. Stat. § 121A.45, subd. 2(a).[4]

A.D. then filed a petition for a writ of certiorari with the court of appeals. *See* Minn. Stat. § 14.63 (2014). The court of appeals addressed both the "willful violation" and endangerment grounds that the Board relied on to expel A.D., Minn. Stat. § 121A.45, subd. 2(a), (c). *In re Expulsion of A.D.*, 2015 WL 4393395, at \*1. Citing to our decision in *Garrity v. Kemper Motor Sales*, 280 Minn. 202, 207, 159 N.W.2d 103, 107 (1968), the court of appeals held that a "willful violation," as the term is used in the Act, "requires not just that a student violates a school policy but also that the student is aware of the

---

[4] The Commissioner did not reach either of the other two grounds for dismissal that the District included in the Notice of Proposed Expulsion.

6

policy and makes a 'deliberate, conscious, and intentional choice' to violate the policy." 2015 WL 4393395, at *5 (quoting *Garrity*, 280 Minn. at 207, 159 N.W.2d at 107). The court of appeals also held that the language and structure of Minn. Stat. § 121A.45, subd. 2(c), "requires something more than conduct that creates the mere possibility of harm" to constitute endangerment. 2015 WL 4393395, at *6. Because the Board's findings were not sufficient to support the conclusion that A.D. willfully violated the District policy or willfully conducted herself in a manner that endangered herself or others, the court of appeals reversed the decisions of both the Board and the Commissioner. *Id*. at *7. We granted the District's petition for review.

On appeal, the District first contends that the court of appeals erred in interpreting the Act's "willful violation" provision, Minn. Stat. § 121A.45, subd. 2(a), to require that a student make a deliberate, conscious, and intentional choice to violate a policy. The District further argues that the court of appeals erred in concluding that a student must have actual knowledge of a policy to allow dismissal under the provision. The District also argues that the court of appeals improperly held that the endangerment provision of the Act, Minn. Stat. § 121A.45, subd. 2(c), requires a finding of "probable harm or loss." As to both statutory grounds, the District maintains that there was substantial evidence to warrant A.D.'s expulsion. We consider each statutory basis in turn.

I.

We first address the "willful violation" provision. This provision grants school districts the authority to suspend or expel a student upon finding a "willful violation of any reasonable school board regulation." Minn. Stat. § 121A.45, subd. 2(a). The

provision further provides that "[s]uch regulation must be clear and definite to provide notice to pupils that they must conform their conduct to its requirements." *Id.* At issue is whether, as the court of appeals held, a student must make a "deliberate, conscious, and intentional choice" to violate a reasonable school policy in order to be expelled under the "willful violation" provision of the Act. *In re Expulsion of A.D.*, 2015 WL 4393395, at *5.

The District asks us to reverse the court of appeals, arguing that the phrase "willful violation," at least in the student discipline context, includes not only intentional, deliberate violations, but also actions taken in "careless disregard" of a school policy. The District also argues that an "actual knowledge" requirement, whereby a student must be aware of the relevant policy in order to be charged with its willful violation, is contrary to the plain language of the statute. Based on its proffered interpretation of this provision, the District argues there is substantial evidence in the record to support A.D.'s dismissal.

A.D., on the other hand, argues that the plain language of the Act allows for dismissal only when a student makes a deliberate, conscious, and intentional choice to violate a reasonable school policy, and that there is insufficient evidence in the record that A.D. intentionally and deliberately violated the District's weapons policy. We agree with A.D.

A.

The parties' arguments about the meaning of the "willful violation" provision present a question of statutory interpretation that we review de novo. *Abrahamson v.*

8

*St. Louis Cty. Sch. Dist.*, 819 N.W.2d 129, 133 (Minn. 2012). The goal of all statutory interpretation is to determine and effectuate the intent of the Legislature. *Emerson v. Sch. Bd. of Indep. Sch. Dist. 199*, 809 N.W.2d 679, 682 (Minn. 2012); *see* Minn. Stat. § 645.08 (2014). If the language of the statute is clear and unambiguous, the plain language of the statute controls, and we will not disregard the letter of the law to pursue the spirit of the law. Minn. Stat. § 645.16 (2014).

We begin our analysis with the language of the statute. *Weiler v. Ritchie, 784N.W.2d 879, 884 (Minn. 2010).* The Act provides that a student may be dismissed for a "willful violation of any reasonable school board regulation." Minn. Stat. § 121A.45, subd. 2(a). The Act does not define the term "willful." But when interpreting a statute, we give words their "plain and ordinary meaning." *Emerson*, 809 N.W.2d at 682. In the absence of a definition in the statute, we often look to dictionary definitions to determine the plain meaning of words. *Larson v. Nw. Mut. Life Ins. Co.*, 855 N.W.2d 293, 301 (Minn. 2014); *see also Abrahamson*, 819 N.W.2d at 133 ("We construe the words of a statute 'according to their common and approved usage.'" (quoting Minn. Stat. § 645.08(1))). *The American Heritage Dictionary of the English Language* defines "willful" as "[s]aid or done on purpose; deliberate." 1982 (5th ed. 2011); *see also Webster's Third New International Dictionary* 2617 (2002) (defining "willful" as "done deliberately: not accidental or without purpose"; "intentional"); *The New Oxford American Dictionary* 1931 (2001) (defining "willful" as "intentional; deliberate"); *Merriam-Webster's Collegiate Dictionary* 1349 (10th ed. 2001) ("[W]illful: done deliberately"; "intentional."). Consistent with these definitions, the plain meaning of

9

"willful violation" requires that a student be aware of the policy and make a deliberate decision to violate it.[5]

The District does not disagree that a deliberate and intentional violation subjects a student to expulsion. But, the District argues, the phrase "willful violation" also includes actions taken in "careless" or "reckless" disregard of school policy. The District also argues that A.D. did not have to know that she was in violation of the policy for the District to have grounds to dismiss her. Neither of these arguments is consistent with the plain meaning of "willful violation."[6]

In support of its argument that "willful violation" includes careless or reckless violations, the District cites a Minnesota Court of Appeals decision and a number of Supreme Court cases in which the Court defined "willful violation" to include reckless

---

[5] This interpretation of "willful violation" is consistent with our decision in *Garrity v. Kemper Motor Sales*, 280 Minn. 202, 159 N.W.2d 103 (1968), which arose in the context of discovery in a civil case. There, a defendant moved to dismiss an action based on the plaintiff's refusal to answer a set of interrogatories. *Id.* at 205, 159 N.W.2d at 106. The version of Minn. R. Civ. P. 37.04 in effect at the time authorized dismissal of a case "where a party has willfully violated the discovery rules in a manner which defeats their purpose." 280 Minn. at 207, 159 N.W.2d at 107. We stated that "[f]or a failure to answer to be willful, it is necessary that there be a knowing awareness of the duty imposed by the rules . . . and, in spite of this awareness, a deliberate, conscious, and intentional choice to disregard this duty." *Id.* at 207, 159 N.W.2d at 107.

[6] The District also contends that because it is reasonable, we should defer to the Commissioner's interpretation of the Act. Because the language of the Act is not ambiguous, we do not consider whether any deference is owed to the Commissioner's administrative interpretation of the Act. *See Hutchinson Tech., Inc. v. Comm'r of Revenue*, 698 N.W.2d 1, 14 (Minn. 2005) ("Administrative interpretations do not control our interpretation of a statute when the language of the statute is clear. We only look to legislative and administrative interpretations of a statute when the words of the law are not explicit.").

behavior under several federal statutes. *In re Lawful Gambling License of Henry Youth Hockey Ass'n*, 511 N.W.2d 452, 456 (Minn. App.) (recognizing a "pattern of willful violations" of Gambling Board rules based on the party's "careless disregard of legal requirements"), *modified in part on other grounds mem.*, 559 N.W.2d 410 (Minn. 1994); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well . . . ."); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132-33 (1988) (defining "willful" for purposes of the Fair Labor Standards Act to include claims of "reckless" violation); *United States v. Ill. Cent. R.R.*, 303 U.S. 239, 242-43 (1938) (defining "willfully," as used in a civil penalty provision, to include "conduct marked by careless disregard"). Neither *Henry Youth Hockey* nor the federal cases support the application of the careless-disregard standard in this case.

*Henry Youth Hockey* is not binding on our court; in addition, the *Henry Youth Hockey* court relied on federal cases, some also cited by the District, which address the definition of "willful" under several federal statutes that contain materially different language than the statutory provision at issue here. *See* 511 N.W.2d at 456. These cases therefore do not provide a basis for us to depart from the plain meaning of "willful violation."

Separate from its argument that the Act includes careless or reckless violations, the District also argues that the plain language of the Act does not require that the student have knowledge of the District policy. There is no dispute in this case that A.D. knew of the District's weapons policy. Nevertheless, the District argues that a student does not

11

need to be aware of a school policy in order to be expelled for willfully violating the policy. We disagree.

The statute does not specifically address whether a student must know of a school's policy in order for it to be the basis for dismissal. *See* Minn. Stat. § 121A.45, subd. 2(a). A knowledge requirement, however, is implicit in the plain meaning of the word "willful." A student cannot intentionally violate a policy, or conform to its requirements, without first knowing that it exists. We recognized as much in *Garrity* when we found that a willful violation required a "knowing awareness" of the rule being violated. 280 Minn. at 207, 159 N.W.2d at 107. The plain meaning of "willful" compels the same conclusion here.[7]

In sum, the plain language of Minn. Stat. § 121A.45, subd. 2(a), requires that a student know of a school policy and make a deliberate, intentional decision to violate that policy before the student may be dismissed under the "willful violation" provision of the Act.

B.

With this definition of "willful violation" in mind, we turn next to the question of whether substantial evidence supports the Board's decision to expel A.D. for a willful

---

[7]    The District is apparently arguing for a constructive knowledge standard. The District notes that the Act requires that the policy "be clear and definite to provide notice to pupils that they must conform their conduct to its requirements." Minn. Stat. § 121A.45, subd. 2(a). The District contends that this language "suggests that the policy must be capable of providing notice, not that the policy did provide notice." Because A.D. had actual knowledge of the District's weapons policy, we need not decide whether constructive knowledge of the policy would have been sufficient for dismissal under the "willful violation" provision.

12

violation of the District's weapons policy. A school board decision "will be reversed when it is fraudulent, arbitrary, unreasonable, unsupported by substantial evidence, not within its jurisdiction, or based on an error of law." *Dokmo v. Indep. Sch. Dist. No. 11, Anoka-Hennepin*, 459 N.W.2d 671, 675 (Minn. 1990). If the agency's findings are insufficient, "the case can be either remanded for additional findings or reversed for lacking substantial evidence supporting the decision." *Id.*; *see also* Minn. Stat. § 14.69 (2014) ("[T]he [reviewing] court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioner[] may have been prejudiced . . . ."). Remand is appropriate " 'to permit further evidence to be taken or additional findings to be made in accordance with the applicable law.' " *Dokmo*, 459 N.W.2d at 675 (quoting *State ex rel. Ging v. Bd. of Educ. of Duluth*, 213 Minn. 550, 589, 7 N.W.2d 544, 564 (1942)). School board determinations, "however, have also been reversed for failing to show a substantial basis in the record or for misapplying the applicable law." *Id.*

We have said that a substantial basis in the record to support an agency's determination exists where, considering the evidence in its entirety, there is relevant evidence that a reasonable person would accept as adequate to support a conclusion; the substantial-evidence standard requires more than "a scintilla of evidence" and more than "some" or "any" evidence. *Cable Commc'ns Bd. v. Nor-West Cable Commc'ns P'ship*, 356 N.W.2d 658, 668 (Minn. 1984) (citing *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn. 1977)). The substantial-evidence standard addresses "the reasonableness of what the agency did on the basis of the evidence before it." *United*

13

*States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963). We must defer to an agency's decision so long as it is reasonable and supported by substantial evidence, and we may not substitute our judgment for that of the agency. *Cable Commc'ns Bd.*, 356 N.W.2d at 668-69.

In support of its determination that A.D. willfully violated the District's weapons policy, the Board found:

> The Student admitted that the knife was hers, and that she brought it to school with her when she brought her purse to school. The Student knew, or should have known, that she could be expelled for bringing a knife to school. While she "stated that she" simply forgot that the knife was in her bag, she admitted that she immediately remembered that the knife was in her bag when the notice was made about the locker searches, but she did not immediately report it to her teachers or the Principal.

In finding that the student "forgot that the knife was in her bag," the Board proceeded from the premise that accidentally bringing a pocketknife to school was a "willful violation" of the District's weapons policy. The Commissioner reached the same conclusion. As we explained above, however, this behavior does not constitute a willful violation. Both the Board and the Commissioner, therefore, misapplied the "willful violation" provision in the Act. *Dokmo*, 459 N.W.2d at 675 (noting that an administrative decision will be set aside when misapplication of the law infects the decision).

In the alternative, the District argues that, even if we hold, as we do above, that "willful violation" requires actual knowledge and an intentional choice to violate the policy, the evidence is still sufficient to sustain the dismissal. The record does not leave room for such a conclusion. The Board's findings of fact demonstrate that A.D. willfully

14

placed the pocketknife in her purse over the weekend and willfully brought that purse to school the next week. But the provision at issue in the Act does not allow for the punishment of a student who engages in willful acts without intending to violate the policy. In other words, willful conduct is not the same thing as a willful violation. The Act makes this clear by listing the "willful violation" ground for dismissal and the willful conduct grounds in separate provisions. *Compare* Minn. Stat. § 121A.45, subd. 2(a) (listing the "willful violation" ground), *with* Minn. Stat. § 121A.45, subd. 2(b), (c) (listing "willful conduct" grounds). Because the District had a policy prohibiting the possession of a pocketknife on school grounds, the school had a right, under that policy, to punish A.D. for her inadvertent possession of the pocketknife. Under the Act, however, the District had no authority to dismiss A.D. without showing that she intentionally violated the policy. Because there is no evidence in the record that A.D. intentionally violated the District's weapons policy when she forgot to remove the pocketknife from the purse she brought to school on the day in question, the District's expulsion decision was not supported by substantial evidence.

In urging us to reach the opposite conclusion and uphold the expulsion, the District contends that A.D. deliberately and intentionally violated the District's weapons policy by remaining silent about the pocketknife once she remembered it was in her purse. In other words, the District argues that because A.D. continued to keep the knife a secret after she remembered that she had accidentally brought it to school, she willfully violated the District's weapons policy. The Board, however, did not explicitly conclude that A.D.'s failure to report the existence of the knife constituted a willful violation of the

15

District's weapons policy. *See In re Minn. Power*, 838 N.W.2d 747, 757 (Minn. 2013) (explaining that a reviewing court will uphold an agency decision only where "the agency has adequately explained how it derived its conclusion," and where "that conclusion is reasonable on the basis of the record" (quoting *Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n*, 342 N.W.2d 324, 330 (Minn. 1983))); *see also Cable Commc'ns Bd.*, 356 N.W.2d at 669 (recognizing that judicial intervention is proper "where there is a 'combination of danger signals which suggest the agency has not taken a "hard look" at the salient problems' and the decision lacks 'articulated standards and reflective findings' " (quoting *Reserve Mining Co.*, 256 N.W.2d at 825)). Instead, the Board found only that "when the lockdown was announced," A.D. remembered that the pocketknife was in her purse, but "did not report" it to the school.[8]

To the extent that the District relies on this finding to support its expulsion decision, the District suggests only that A.D. failed to take advantage of the District's safe harbor provision to avoid punishment. But the District concedes that the failure to comply with the safe harbor provision of the weapons policy, which allows a student to avoid punishment for the accidental possession of a weapon if the student immediately informs a teacher or administrator of the possession, is not a separate violation of the

---

[8]     On this point, the Commissioner said: "The District provided notice of a procedure by which a student who accidentally brings a weapon to school may divest herself of that weapon and suffer no consequences. The Student here had the opportunity to escape consequences for possessing a knife at school but chose not to do so." The Commissioner likewise did not "articulate[] standards" or make "reflective findings" as to how A.D.'s after-the-fact recognition that she violated the District's weapons policy itself establishes a separate violation of the policy. *Reserve Mining Co.*, 256 N.W.2d at 825.

16

weapons policy.  Based on this concession, the only evidence in the record is A.D.'s inadvertent possession of the knife, which we have concluded is not substantial evidence that A.D. intentionally violated the District's weapons policy.

Moreover, the evidence is conflicting as to when A.D. remembered the knife was in her purse.  The District focuses on A.D.'s admission to the principal that she remembered the knife was in her purse when she learned of the lockdown.  But at the evidentiary hearing, A.D. testified, "I guess I should have reported it, but it was - - you know, I forgot it was in there.  I didn't even know it was in there at that time."  The Board did not explicitly weigh the testimony, explain how it resolved this discrepancy in A.D.'s statements, or even specifically address A.D.'s credibility in its findings of fact. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").[9]

In sum, the Board did not explain in its findings how A.D.'s secrecy of the knife after she apparently remembered that she had accidentally brought it to school constitutes a willful violation of the District's weapons policy.  And the Board's decision does not reflect how the Board resolved A.D.'s conflicting statements about when she realized that she had a pocketknife in her purse.  Based on these deficiencies, we cannot conclude on

---

[9] The District argues that the court of appeals held the Board to an unreasonable standard of specificity when it faulted the Board for failing to find that A.D.'s testimony that she forgot she possessed the pocketknife was not credible.  There may be some instances in which the direct evidence so conclusively supports a finding of a willful violation that a credibility determination is not required to dismiss a student.  Here, however, where the only evidence of intentionality was A.D.'s mental state and her conflicting testimony about it, the Board could not justify its finding of an intentional violation without resolving the conflict in A.D.'s testimony.

17

this record that substantial evidence supports the Board's determination that A.D. willfully violated the District's weapons policy.

## II.

We next consider the endangerment ground for A.D.'s dismissal. *See* Minn. Stat. § 121A.45, subd. 2(c). The Commissioner's final decision, from which A.D.'s appeal was taken, did not affirm A.D.'s expulsion on this ground. Generally, we will not consider an issue not addressed below. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). We may, however, "decide an issue not determined [below] . . . where there is no possible advantage or disadvantage to either party in not having a prior ruling on the question." *Harms v. Indep. Sch. Dist. No. 300, LaCrescent*, 450 N.W.2d 571, 577 (Minn. 1990). Parties are not disadvantaged when the previously unaddressed issue involves a question of law and the parties had an opportunity to brief the issue. *McKenzie v. State*, 872 N.W.2d 865, 872 (Minn. 2015). Here, both parties addressed the endangerment ground for dismissal at the expulsion hearing before the Board, and the Board made a specific finding on that ground. The parties also addressed the endangerment ground in their briefs to the court of appeals, and the court of appeals decided this issue. Finally, the District included this ground in its petition for review to our court, which we granted in full, and both parties briefed the issue. We therefore address the endangerment provision of the Act in the interest of judicial economy. *See Frazier v. Burlington N. Santa Fe Corp.*, 811 N.W.2d 618, 628-29 (Minn. 2012) (addressing, in the interest of

18

judicial economy, a question briefed by the parties where the record was sufficient to decide the remaining issues).[10]

Under the endangerment provision, a student may be dismissed from school for "willful conduct that endangers the pupil or other pupils, or surrounding persons, including school district employees, or property of the school." Minn. Stat. § 121A.45, subd. 2(c). The District contends that the court of appeals erred in defining the word "endanger" as "to bring into danger or peril of probable harm or loss" and concluding that there was not substantial evidence in the record to suggest A.D. put herself or those around her in peril of probable harm. *In re Expulsion of A.D.*, 2015 WL 4393395, at *6 (quoting *Webster's Third New International Dictionary* 748 (3d ed. 1961)). For her part, A.D. argues that the court of appeals was correct in determining that the endangerment provision "requires something more than conduct that creates the mere possibility of harm" to form the basis for a valid dismissal. *Id.*

The interpretation of the endangerment provision is a question of law subject to de novo review. *Abrahamson v. St. Louis Cty. Sch. Dist.*, 819 N.W.2d 129, 133 (Minn. 2012). If the language of the statute is clear and unambiguous, the plain language of the statute controls. Minn. Stat. § 645.16.

---

[10]    The court of appeals has said that, "in form," the Commissioner's decision is the decision subject to appellate review, even though "in substance" it reviews "the school board's decision directly." *In re Expulsion of N.Y.B.*, 750 N.W.2d 318, 323 (Minn. App. 2008). We need not decide the accuracy of this explanation, however, because as noted above, the endangerment ground has been fully contested at all stages of the proceedings.

The term "endangers" is not defined in the statute, and so we again look to dictionary definitions to determine the plain and ordinary meaning of the word. *Larson*, 855 N.W.2d at 301. *The American Heritage Dictionary of the English Language* defines "endanger" as "[t]o expose to harm or danger; imperil." 607 (3d ed. 1996). Other dictionaries include similar definitions. *See The New Oxford American Dictionary* 561 (2001) (defining "endanger" as to "put (someone or something) at risk or in danger"); *Black's Law Dictionary* 568 (8th ed. 2004) (defining "endanger" as "exposure to peril or harm").

The dictionary definition upon which the court of appeals relied, however, defines "endanger" as "to bring into danger or peril of *probable* harm or loss." *Webster's Third New International Dictionary* (3d ed. 1961) (emphasis added), *quoted in In re Expulsion of A.D.*, 2015 WL 4393395, at *6. By referring to probability, this definition arguably indicates that endangerment can involve an assessment of potentiality. *See United States v. Jarvis*, 258 F.3d 235, 244 (3d Cir. 2001) (stating that the term "endangerment" "necessarily refers to potentiality").[11]

It is not necessary for us to fully define the parameters of the endangerment provision in the Act, because even if we were to interpret the provision to cover willful conduct that exposes others to probable harm, as the court of appeals held, the record

---

[11]    In *Jarvis*, the court cites the definition of "endanger" relied upon by the court of appeals, "to bring into danger or peril of *probable* harm," to stress that endangerment includes the *risk* of harm in addition to actual harm. 258 F.3d at 244 (emphasis added). The court does not use the term "probable" to describe the quantum of risk necessary for endangerment.

does not contain substantial evidence that A.D. exposed anyone to actual or even probable harm. In its order following the expulsion hearing, the Board concluded that A.D. engaged in "willful conduct that endangered the Student, other pupils, and surrounding persons,"[12] stating that she "created a material and substantial risk of harm to other students and staff by possessing a knife on school property." The Board did not, however, make any findings of fact as to the danger posed by the presence of a pocketknife in a purse in a locker on school grounds.

The District nevertheless maintains that the mere presence of a weapon on school grounds, despite the fact that no one knew of its presence and no one could have accessed the pocketknife without going through A.D.'s purse in her locker, endangered the safety of the student and others. The District cites the school superintendent's testimony at the expulsion hearing that "[a]nytime a weapon is in the building, there is that risk and possibility that we could have harm done to people"; "it could get in the wrong hands." The District specifically contends that the "risk and possibility that [there] could [be] harm done to people," combined with the inherently dangerous nature of a pocketknife, constitutes substantial evidence of endangerment. But in *In re Welfare of C.R.M.*, 611 N.W.2d 802, 810 (Minn. 2000), we rejected the contention that a similarly sized pocketknife was inherently dangerous.[13] The record in this case does not support a

---

[12]    Neither party to this appeal argues, or argued below, that A.D. did not engage in willful *conduct*. Rather, the parties contest the element of endangerment.

[13]    The District argues that *C.R.M.* is distinguishable because it involves the interpretation of a criminal statute in which we relied "on the strict standards for

21

contrary conclusion. Although A.D's locker was unlocked on the day of the search, the school liaison officer conceded that there was no evidence that A.D. told anyone of the pocketknife's presence, displayed the pocketknife, or removed the pocketknife from her purse at any time. There likewise is no evidence in the record that anyone even knew the knife was there or talked about it before the officer secured it.

Based on the record, which does not reflect that any student or staff member was even aware of the presence of the pocketknife or that any student or staff member had reason to access A.D.'s locker and discover the knife's presence, the risk and possibility of harm is too tenuous to constitute substantial evidence of endangerment. The record is simply devoid of evidence that suggests endangerment results from the mere presence of a forgotten 3-inch pocketknife.[14]

---

identifying whether the legislature intended to create a strict liability statute in the context of criminal law." *See C.R.M.*, 611 N.W.2d at 807 (recognizing "the distinction between strict liability crimes and those requiring a mens rea"). That may be true, but A.D. does not cite *C.R.M.* to support her proposed interpretation of the Act. Rather A.D. relies on *C.R.M.* to argue that in some cases, a pocketknife is not inherently dangerous. *C.R.M.* is relevant to the case before us because the only evidence of endangerment here was the supposed inherently dangerous nature of A.D.'s pocketknife and its presence on school grounds. Although the presence of a pocketknife may be "some" evidence of endangerment, "in view of the entire record as submitted," the Board's findings were not based on "substantial evidence" of endangerment as required by Minn. Stat. § 14.69. *Cable Commc'ns Bd.*, 356 N.W.2d at 668.

[14] Contrary to the District's argument that affirming the court of appeals' decision in this case would "essentially open the flood gates and allow[] all manner of weapons into the school," our decision regarding the unknowing possession of a pocketknife on school grounds will not affect the ability of schools to expel students for the possession of firearms. This is so because the Act treats possession of guns differently from possession of knives. Minnesota Statutes § 121A.44 provides generally that "a school board must

22

Lastly, the District argues that courts should defer to a school board's determination of what conduct endangers students. *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("Judicial interposition in the operation of the public school system . . . raises problems requiring care and restraint."). We do not intend to suggest that there is never any danger from the mere presence of a pocketknife at a school, whether or not others are aware of its presence or can access it. Our conclusion here is simply that the record *in this case* does not contain substantial evidence of endangerment. We defer to a school board's policy determinations insofar as they are permissible under the statutory scheme. But in this case, the statutory standard is not met and deference is not warranted.

Affirmed.

LILLEHAUG, J., took no part in the consideration or decision of this case.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

expel for a period of at least one year a pupil who is *determined to have brought* a firearm to school." (Emphasis added.)