CHUTICH, Justice.
J.W. tragically died of a drug overdose 5 days after voluntarily departing a supervised living facility, appellant RS Eden, where he had received treatment for 6 days. The Commissioner of Human Services (Commissioner) determined that RS Eden was responsible for maltreatment of J.W. by neglect. Because the record shows that RS Eden complied with the rules regarding the disposition of controlled substances and took reasonable measures to protect J.W., the Commissioner's decision is not supported by substantial evidence. We therefore reverse.
FACTS
On February 20, 2016, 28-year-old J.W. was admitted to Fairview Medical Center for detoxification from heroin. His treating physician at Fairview was Dr. Simon, who was the emergency-room doctor on call that day. Dr. Simon had treated J.W. once before for opiate dependence, but he was not J.W.'s primary physician. Dr. Simon categorized J.W.'s opiate dependence as "very severe," because J.W. had entered *328 repeated detoxifications with subsequent relapses.[1]
J.W. was discharged from the hospital after 5 days with a "Suboxone taper" that Dr. Simon prescribed. Suboxone is a drug composed of naloxone and buprenorphine ; the latter is a narcotic schedule-III controlled substance. Minn. Stat. § 152.02, subd. 4(h) (2018). Suboxone eases heroin withdrawal symptoms without the effect of a high. The taper that Dr. Simon prescribed is designed to gradually decrease the amount of Suboxone over the course of a month. As the amount of Suboxone decreases according to the taper, withdrawal symptoms can include nausea, vomiting, hot and cold flashes, body aches, irritability, and cravings for heroin. Dr. Simon testified that it is common for patients to be prescribed Suboxone without entering a treatment center, and he often prescribes Suboxone to people who do not intend to enter treatment centers. Suboxone has a street value for illegal use, although it is safer and less marketable than heroin.
J.W.'s taper began with an 8-milligram dose of Suboxone each day for 4 days. After 4 days, the dosage went to 6 milligrams, and then the dosage would have continued to lessen every 4 days. When J.W. left Fairview on February 25, he was on the first "step down," receiving 6 milligrams of Suboxone each day. The Suboxone taper was supposed to continue until March 19, 2016.
J.W. was discharged from Fairview "door-to-door" to RS Eden at 7 a.m., which meant that he was supposed to go directly to RS Eden. The purpose of discharging J.W. door-to-door was to prevent him from spending any time in the community during which he might relapse. Nevertheless, J.W. did not go directly to RS Eden. Instead, according to his counselor at RS Eden, J.W. used "up to a gram of heroin that day and smoked some weed." He then went to RS Eden around noon.
A counselor conducted an intake of J.W. including a urine analysis and a psychological evaluation. Based on the evaluation, the counselor created an individualized treatment plan for J.W., with a contemplated completion date of September 13, 2016, just over 6 months after he arrived. J.W. did not have the Suboxone with him when he arrived at RS Eden; his mother picked up the prescription and brought it to him that afternoon.
On March 1, J.W. had two conversations with his counselor at RS Eden in which J.W. expressed concerns that his Suboxone taper was coming to an end. Although J.W. actually had 3 weeks left of his prescription, his counselor did not know that and did not tell J.W. how much Suboxone he had left. Clients administer their own medication at RS Eden: when it was time for J.W. to take his medication, he removed his own prescription bottle from the secured locker and took his medication under staff supervision. A nurse who oversaw J.W.'s medication said that J.W.'s real concern was not that his Suboxone was about to end, but that a taper to a lower dosage was about to occur, and he was worried about withdrawal symptoms.
In response to J.W.'s concerns, a nurse set up a meeting with RS Eden's on-staff doctor to discuss a prescription for Clonidine for J.W. Clonidine can help reduce withdrawal symptoms occurring with a Suboxone taper. J.W., the doctor, and the nurse met sometime after 9:00 a.m. on March 2, but J.W. said that he did not want Clonidine. The doctor told him that if he changed his mind, the doctor could write a prescription for him. The record *329 shows that the doctor did in fact write a prescription for Clonidine for J.W. at 12:37 p.m. on March 2.
Shortly after the meeting with RS Eden's doctor, J.W. prepared to leave RS Eden. A nurse saw him at the door and asked what he was doing. When J.W. responded that he was leaving, the nurse asked him to wait so that she could give him some of his medications. She collected those medications for J.W. but then told him that she could not release the Suboxone. J.W. said that was fine and told her he was "going to do an intake at NuWay," another treatment program.
An RS Eden program director saw J.W. and the nurse in the hallway, and she encouraged J.W. to stay. She also encouraged him to go to the pharmacy to pick up the Clonidine that was waiting for him if he did not want to wait for it at RS Eden. J.W. left RS Eden despite the nurse and the program director informing him that "being in withdrawal left him highly vulnerable to overdose were he to relapse into heroin use." J.W. left at approximately 2:00 p.m. on March 2, 2016. He had been at RS Eden only 6 days. Less than 10 minutes had elapsed between the time when J.W. informed staff that he was leaving and when he walked out the door.
Despite his announced intentions, J.W. did not go to NuWay or any other treatment facility. Instead, he went to his mother's home. The next day, Thursday, March 3, J.W.'s mother called RS Eden to try to obtain the Suboxone, but she was unable to reach anyone. She called again on Friday, March 4, and a staff member told her that she would need to speak to the nurse when the nurse returned on March 7. J.W.'s mother also spoke to the RS Eden program director, who told her the law did not allow the facility to release the Suboxone. J.W.'s mother contacted Fairview, but Fairview officials could not offer help because J.W. was not a patient. Fairview officials told her to contact the Minnesota Department of Human Services, which she did on March 4. The person she talked to at the Department "said that she would bring it to someone's attention ASAP." The Department opened a licensing investigation into RS Eden's treatment of J.W. that same day.
On Monday, March 7, J.W.'s mother called RS Eden and demanded that the nurse release the Suboxone. The nurse explained that she could not discuss J.W.'s case with his mother because J.W. had not authorized RS Eden to do so and that she could not release the Suboxone"because of the law."[2]
J.W. himself never reached out to anyone at RS Eden or Fairview after leaving the facility. He did text his probation officer to tell her that he had left treatment; he denied that he was using opiates. The probation officer called J.W.'s counselor at RS Eden to get information about how J.W. had been doing before he left treatment.
RS Eden did not attempt to contact the Fairview doctor, Dr. Simon, either before or after J.W. left the facility. Dr. Simon was not listed on J.W.'s files at RS Eden as a primary physician. The only place that Dr. Simon's name appeared was on J.W.'s Suboxone prescription bottle as the prescribing physician. In addition, RS Eden did not seek a waiver from the regulatory authorities to release J.W.'s Suboxone to him. RS Eden's manual stated that controlled substances would be destroyed upon a client's departure.
*330 On March 7, 2016, only 5 days after abruptly leaving RS Eden, J.W. died of an overdose. The official cause of death was identified as "mixed drug toxicity," which included "heroin, methamphetamine, and alprazolam (Xanax )."
On March 25, the Minnesota Department of Human Services changed its investigation into RS Eden from a licensing investigation to a maltreatment investigation. An investigator interviewed the RS Eden nurse, doctor, and program director who played a role in J.W.'s care and departure. He also interviewed Dr. Simon and J.W.'s mother. The investigator asked the Minnesota Department of Health about RS Eden's refusal to release J.W.'s Suboxone, and a health-facility-evaluation supervisor said that RS Eden "was in compliance with ... regulations by not releasing the individual's controlled medications at the time of discharge."
The Minnesota Department of Human Services issued a determination of maltreatment by neglect on July 20, 2016, and ordered RS Eden to pay a fine. The investigative report stated that RS Eden should have contacted Dr. Simon or obtained a waiver from the Minnesota Department of Health to allow release of J.W.'s Suboxone to him. RS Eden appealed the determination of maltreatment.
The appeal came before an administrative law judge. Following a hearing,[3] the administrative law judge recommended that the Department's determination of maltreatment be reversed and the order to pay a fine be vacated. In his memorandum, the administrative law judge found that RS Eden complied with all applicable laws regarding the release of controlled substances by a supervised living facility.
The Commissioner did not adopt the administrative law judge's recommendation but instead affirmed the maltreatment determination against RS Eden. The Commissioner concluded that J.W. was a vulnerable adult under Minnesota Statutes section 626.5572, subdivision 21(a)(4) (2018)"while in the process of and after leaving RS Eden." The Commissioner found that, while J.W. was in RS Eden's care, the facility had a duty to extend to him necessary care, including "enabling him to maintain his own health and safety once he was no longer under the purview of RS Eden." The Commissioner determined that RS Eden should have had a general waiver in place to release Suboxone because of the high-level-needs clients that RS Eden served, and, failing that, should have made every effort to obtain an individual waiver for J.W. by contacting J.W.'s prescribing physician, Dr. Simon.
RS Eden appealed the maltreatment determination and fine to the court of appeals, which affirmed. In re Appeal by RS Eden/Eden House of the Determination of Maltreatment & Order to Pay a Fine , No. A17-1604, 2018 WL 2293276, at *1 (Minn. App. May 21, 2018). The court of appeals separately addressed RS Eden's failure to obtain a waiver of the Minnesota Department of Health rule prohibiting release of controlled substances and RS Eden's failure to contact Dr. Simon. Id. at *3.
On the waiver question, the court of appeals concluded that RS Eden complied with the administrative rule that required it to destroy controlled substances upon a client's discharge. Id. at *4 (discussing Minn. R. 4665.4600 (2017) ). The court of appeals further held that RS Eden was not *331 required to obtain a waiver under the rules. Id. And the court noted that Dr. Simon could not have helped RS Eden obtain an individual waiver of the rule, because waivers have to be obtained from the Commissioner of Health. Id. at *5. The court therefore rejected the Commissioner's decision that RS Eden maltreated J.W. by failing to obtain a waiver of rule 4665.4600. Id.
But the court of appeals held that substantial record evidence supported the Commissioner's determination "that RS Eden's failure to make any effort to confer with Dr. Simon given J.W.'s imminent departure without his recently prescribed Suboxone constituted maltreatment by neglect." Id. at *7. The court held that, although the record did not support the Commissioner's statement that Dr. Simon could have waived the rule requiring destruction of controlled substances, "the record [did] not foreclose the possibility that Dr. Simon could have otherwise assisted J.W. to obtain Suboxone after he left RS Eden." Id. at *5. Under the circumstances, the court held that it was reasonable and necessary for RS Eden to make an effort to confer with the doctor before J.W. left the facility without the Suboxone. Id. at *6.
We granted RS Eden's petition for review.
ANALYSIS
The Commissioner's determination that RS Eden was responsible for maltreatment by neglect hinges on the relationship between a statute, Minnesota Statutes section 626.5572 (2018), and the administrative rules, specifically Minnesota Rules 4665.4600, .0600 (2017).
Section 626.5572 defines maltreatment by neglect as "[t]he failure or omission by a caregiver to supply a vulnerable adult with care or services" that are "reasonable and necessary to obtain or maintain the vulnerable adult's physical or mental health or safety, considering the physical and mental capacity or dysfunction of the vulnerable adult." Minn. Stat. § 626.5572, subd. 17(a)(1). The statute further states that "a vulnerable adult is not neglected for the sole reason that" the vulnerable adult "refuses consent or withdraws consent, ... to any therapeutic conduct, including any care, service, or procedure to diagnose, maintain, or treat the physical or mental condition of the vulnerable adult." Id. , subd. 17(c)(1).
That same statute defines a "vulnerable adult." Id. , subd. 21(a). The statute provides in pertinent part that a "vulnerable adult" is:
any person 18 years of age or older who:
(1) is a resident or inpatient of a facility [or] ...
....
(4) regardless of residence or whether any type of service is received, possesses a physical or mental infirmity or other physical, mental, or emotional dysfunction:
(i) that impairs the individual's ability to provide adequately for the individual's own care without assistance, including the provision of food, shelter, clothing, health care, or supervision; and
(ii) because of the dysfunction or infirmity and the need for care or services, the individual has an impaired ability to protect the individual's self from maltreatment.
Id. , subd. 21(a)(1), (4).[4]
As mentioned above, two administrative rules are relevant. First, *332 Minnesota Rule 4665.4600 concerns the disposition of medications and states that "[i]f authorized by the attending physician or the resident's physician, medications belonging to residents shall be given to them when discharged or transferred." The rule also states, however, that "[u]nused portions of controlled substances shall be handled by contacting the Minnesota Board of Pharmacy, which will furnish the necessary instructions and appropriate forms." Id . Although the rule does not specifically state that controlled substances must be destroyed, the parties do not dispute that destruction is a requirement; the Department of Health bulletin, referenced below, assumes that it is a requirement; and all previous decision-makers have likewise agreed with that requirement. We accept that destruction is a requirement for purposes of this case.
Second, another rule in Chapter 4665 states that "[a] supervised living facility may request in writing a waiver of a specific rule." Minn. R. 4665.0600. The waiver must include "the regulation in question, reasons for requesting the waiver, the period of time the licensee wishes to have the regulation waived, and the equivalent measures planned for protecting the health and safety of residents and staff." Id. Waivers granted by the Commissioner of Health "shall specify in writing the time limitation and required equivalent measures to be taken to protect the health and safety of residents and staff." Id.
In addition, the Minnesota Department of Health has published an information bulletin on controlled substances, Information Bulletin 04-12. The bulletin states that "[c]urrent licensure provisions require that licensees destroy controlled drugs and thus prohibit individuals/responsible parties from taking their controlled drugs with them when discharged or transferred and have prompted individual waiver requests to" the Department of Health. See Discharge/Transfer of Individuals with Possession of Controlled Drugs , Minn. Dep't of Health (July 2004), https://www.health.state.mn.us/facilities/regulation/infobulletins/ib04_12.html (last visited May 15, 2019) [opinion attachment]. The bulletin establishes a "standard licensing waiver process" so that supervised living facilities can "avoid having to submit an individual waiver request" each time. Id. Facilities must follow certain requirements to qualify for a general waiver, including the establishment of written policies and procedures, orders from health care practitioners authorizing the release of prescriptions, identification of parties responsible for the client in the client's medical record, recordkeeping about the release, and signatures of the person releasing the controlled substance and the person receiving it. Id.
RS Eden's internal policy for disposition of medications tracked certain provisions of Minnesota Rule 4665.4600 and the Department of Health bulletin. It stated that "[m]edical staff will use the Drug Destruction Log. Destruction will be conducted by contacting the Minnesota Board of Pharmacy, which will furnish the necessary instructions and appropriate forms."
With this statutory and regulatory background in mind, we turn to the Commissioner's decision. Administrative agency decisions enjoy a "presumption of correctness." Reserve Mining Co. v. Herbst , 256 N.W.2d 808, 824 (Minn. 1977). But we may reverse an agency's decision if it is affected by an error of law, unsupported by substantial evidence, or arbitrary and capricious. Minn. Stat. § 14.69 (2018).
*333 In determining whether the Commissioner's decision is supported by substantial evidence, we "determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n , 342 N.W.2d 324, 330 (Minn. 1983). Substantial evidence requires "more than a scintilla of evidence, more than 'some' evidence, and more than 'any' evidence." Webster v. Hennepin County , 910 N.W.2d 420, 428 (Minn. 2018). "The appellant bears the burden of establishing that the agency findings are not supported by the evidence in the record." In re Review of 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utils. , 768 N.W.2d 112, 118 (Minn. 2009). We review de novo the Commissioner's conclusions of law, including the interpretation of relevant statutes. In re Appeal by Kind Heart Daycare, Inc. v. Comm'r of Human Servs. , 905 N.W.2d 1, 9 (Minn. 2017).
The Commissioner determined that RS Eden maltreated J.W. by failing to obtain a waiver of the Department of Health rule prohibiting release of controlled substances and by failing to contact Dr. Simon, J.W.'s prescribing doctor for Suboxone.[5] The court of appeals reasoned that the Commissioner's first reason (waiver) was not supported by substantial evidence, but affirmed the Commissioner's maltreatment determination and fine based on the second reason (failure to contact Dr. Simon). Although the Commissioner did not cross-appeal the court of appeals' decision regarding the waiver issue, "[i]t is well settled ... that a respondent may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, even though the argument may involve an attack upon the reasoning of the lower court or an insistence upon matters overlooked or ignored by it." Hunt by Hunt v. Sherman , 345 N.W.2d 750, 753 n.3 (Minn. 1984). RS Eden does not object to consideration of the waiver issue. Accordingly, we address each issue.
The Commissioner's determination of maltreatment by neglect for RS Eden's failure to obtain a waiver or to contact Dr. Simon centered around steps RS Eden could have taken before or after J.W. departed RS Eden. As a preliminary matter, we conclude that RS Eden's duty of care to J.W. ended when J.W. discharged himself on March 2. The Commissioner found, by contrast, that RS Eden was responsible for J.W.'s care after he left the facility until the time of his death, because he never withdrew consent to treatment. Such a conclusion ignores the plain language of the statute at issue.
Under the statute, a "caregiver" is "an individual or facility ... who has assumed responsibility for all or a portion of the care of a vulnerable adult voluntarily, by contract, or by agreement." Minn. Stat. § 626.5572, subd. 4 (emphasis added). The plain language of the statute shows that RS Eden ceases to be a caregiver of its clients at the time of discharge because the "contract" or "agreement" under which it assumed responsibility for their care has ended. Accordingly, under subdivision 4, once J.W. was discharged by voluntarily *334 leaving the facility, RS Eden was no longer his "caregiver" and no longer responsible for his care.[6] We therefore address the Commissioner's determination of maltreatment considering only the time when J.W. was in RS Eden's care.
A.
We turn first to the waiver issue. The Department asserts that substantial evidence supports the Commissioner's decision that RS Eden committed maltreatment by failing to make an effort to obtain a waiver of rule 4665.4600. The Department argues that RS Eden was aware of the risk of overdose, but failed to take any steps to follow up to determine what it could do to help J.W. The Commissioner reasoned that RS Eden should have executed the waiver procedures outlined in Information Bulletin 04-12 when J.W. arrived at the facility so that it could give him the necessary care in case he left the facility against the advice of staff.
The court of appeals held that the Commissioner's finding of maltreatment based on RS Eden's failure to seek a waiver of rule 4665.4600 "is untenable because RS Eden did not violate an applicable law or rule." RS Eden , 2018 WL 2293276, at *4. We agree.
RS Eden fully complied with all applicable rules and regulations in refusing to release the Suboxone, and it is unreasonable to penalize the facility for complying with a rule. As the court of appeals noted, "[t]he commissioner's decision suggests that rule 4665.4600 may not be consistent with the provision of reasonable and necessary care and services to certain individuals who seek treatment at licensed facilities and that certain facilities should be expected to obtain a general waiver" of the rule. Id . We agree that, if such inconsistency exists, the proper course is not to penalize facilities for following the rule, but instead to change the rule.
The court of appeals was also correct in determining that Dr. Simon could not have granted RS Eden an individual waiver of rule 4665.4600. Id . at *5. Under the rule, waivers must be obtained from the Commissioner of Health. Furthermore, nothing in the record suggests that the Commissioner of Health would or could have granted RS Eden an individual waiver in this case. Indeed, the record lacks any details regarding what the process of obtaining a waiver involves, including how long it takes, what kind of information the Commissioner of Health needs, and how frequently waivers are granted. Accordingly, the Commissioner's conclusion that RS Eden committed maltreatment by neglect when it failed to obtain an individualized waiver for J.W. is not supported by substantial evidence in the record.
Nor was RS Eden required to have a general waiver system in place. Nothing in Information Bulletin 04-12 or the administrative rules requires facilities to obtain general waivers. RS Eden chose not to obtain the general waiver as part of its treatment philosophy and practices, and the Department cannot punish RS Eden for treatment practices which are fully compliant with the rules even though the Department may prefer that RS Eden used different methods.[7] J.W.'s unfortunate *335 death may or may not have occurred if he had been allowed to take his Suboxone home with him. Nevertheless, if the Department believes that regulations should not prevent a facility like RS Eden from releasing Suboxone, the proper course is to change the regulations governing the destruction of Suboxone, not to penalize a treatment facility that was compliant with those regulations. Because substantial evidence does not support a finding that RS Eden engaged in maltreatment by neglect by failing to obtain a waiver of rule 4665.4600, we affirm the court of appeals on this issue.
B.
We next turn to the second issue: whether substantial evidence supports the Commissioner's conclusion that RS Eden's failure to try to contact Dr. Simon was maltreatment by neglect.
We have not previously interpreted the maltreatment by neglect provision of the Vulnerable Adults Act. Under the statute, a caregiver neglects a vulnerable adult by failing to provide care or services that are "reasonable and necessary to obtain or maintain the vulnerable adult's physical or mental health or safety, considering the physical and mental capacity or dysfunction of the vulnerable adult." Minn. Stat. § 626.5572, subd. 17(a)(1).
The Commissioner determined that it was reasonable and necessary for RS Eden to contact Dr. Simon to request that the doctor authorize the release of J.W.'s prescription of Suboxone through use of an individual waiver. This determination is not supported by substantial evidence because, as discussed above, only the Commissioner of Health may grant a waiver. Nor is it supported factually by Dr. Simon, who testified that he would not expect to be called by RS Eden with questions about J.W.'s medications.
The Department argues nevertheless that, if RS Eden had contacted Dr. Simon, he could have otherwise assisted J.W. to obtain Suboxone after he left RS Eden. The Department hypothesizes that Dr. Simon may have been able to counsel RS Eden on another treatment strategy for J.W. by issuing a new prescription or advising RS Eden on how to obtain a waiver. The Department cites Dr. Simon's testimony that he would have released the Suboxone to J.W. upon his departure from RS Eden because of the high risk of relapse and overdose without the medication.
The Department's argument does not have merit. Because Dr. Simon could not have authorized RS Eden to release the Suboxone already in its possession, a conversation between Dr. Simon and RS Eden could not have accomplished anything. Even if Dr. Simon prescribed J.W. more Suboxone on the word of the facility without speaking to or examining the patient, J.W. would have had to pick up the prescription himself. The same rule that prohibited RS Eden from giving J.W. his Suboxone would have also prevented the facility from releasing a new Suboxone prescription to J.W. See Minn. R. 4665.4600.
Further, the record shows that it is unlikely Dr. Simon could have prescribed Suboxone based on a call from the facility even if he wanted to: the Minnesota Department of Human Services investigator testified that J.W.'s mother called Fairview after J.W.'s discharge from RS Eden, and the hospital said that it would not be able to prescribe any additional Suboxone *336 for him because he was not a current patient. The investigator's report likewise states that Dr. Simon, an emergency-room doctor, could not see J.W. on an outpatient basis, so he could not have refilled the prescription that way either.
Even if a resident's physician did have the power to authorize the release of Suboxone, as the Commissioner claimed, Dr. Simon was not J.W.'s physician. He was not listed as J.W.'s primary physician in RS Eden's records, and J.W. did not regularly see him. He was the attending doctor at the emergency room when J.W. arrived there in crisis. And RS Eden did not violate any rule or statute by failing to contact a doctor whose only known connection to J.W. was that his name was on the prescription bottle for J.W.'s Suboxone.
Simply put, the record evidence is insufficient to support the proposition that any effort by RS Eden to contact Dr. Simon could have prevented J.W.'s death. The maltreatment statute's requirement that caregivers take steps that are "reasonable and necessary to obtain or maintain the vulnerable adult's physical or mental health or safety," Minn. Stat. § 626.5572, subd. 17(a)(1), does not require caregivers to take steps that could not reasonably obtain or maintain the vulnerable adult's safety. Accordingly, the record evidence is insufficient to support the Commissioner's determination that RS Eden is responsible for maltreatment by neglect because of a failure to attempt to confer with Dr. Simon.
In addition, the record shows that in the 10 minutes after J.W. told RS Eden staff members that he was immediately leaving, staff members (1) prescribed Clonidine for J.W.'s withdrawal symptoms;[8] (2) tried to convince J.W. to stay at RS Eden; (3) recommended that J.W. go to another program or an emergency room; (4) recommended that J.W. wait until his Clonidine was available from the pharmacy; (5) advised him about his high vulnerability to overdose if he relapsed into heroin use; (6) asked him to wait so that they could give him his other medications to take with him; and (7) explained that they could not give him his Suboxone. RS Eden also contacted J.W.'s probation officer the next day, who told RS Eden that J.W. had also been in contact and had notified his probation officer that he had left treatment.
Holding RS Eden responsible for maltreatment by neglect for a single act staff members did not take-an action that the Commissioner did not establish had a reasonable likelihood to protect J.W.-does not have substantial support in the record in the face of everything that the facility did do. Such a standard would improperly require RS Eden to take every possible step that may prevent harm, looking at the situation with 20-20 hindsight. Here, RS Eden was not legally required to contact Dr. Simon. RS Eden took numerous reasonable steps to protect J.W. when he told staff members that he was abruptly leaving the facility, and a finding by the Commissioner that these steps were insufficient is not supported by substantial evidence. We therefore hold that RS Eden did not engage in maltreatment by neglect.
CONCLUSION
For the foregoing reasons, we reverse the decision of the court of appeals.
Reversed.
*337 APPENDIX

When J.W. entered Fairview in 2016, his records showed that he had six or seven previous detoxifications and four or five previous treatments.

We recognize that J.W.'s mother admirably took many immediate steps to help her son regain medicine that would help to ease his heroin withdrawal, and that her experience must have been frustrating and heartbreaking.

Seven witnesses testified at the hearing: Dr. Simon, the prescribing doctor at Fairview; the Minnesota Department of Human Services inspector; the president of RS Eden; the Director of Recovery Services at RS Eden; J.W.'s counselor at RS Eden; J.W.'s nurse at RS Eden; and a program director at RS Eden.

The other two definitions of "vulnerable adult" apply to settings that are inapplicable here. Id. , subd. 21(a)(2)-(3).

Although the Commissioner's decision focused on RS Eden's duty to contact Dr. Simon to obtain a waiver of the rule that required RS Eden to retain and destroy J.W.'s Suboxone, the court of appeals concluded that finding was incorrect because Dr. Simon did not have the ability to grant a waiver. 2018 WL 2293276, at *5. The court of appeals held, however, and the Department now articulates, that RS Eden should have contacted Dr. Simon anyway, because he may have been able to provide counseling for RS Eden or to otherwise assist J.W. See id . at *5-6.

Because RS Eden was no longer J.W.'s caregiver after J.W. left the facility, even if J.W. continued to be a vulnerable adult, as the Commissioner found, RS Eden was no longer responsible for his care. Accordingly, we need not reach the issue of whether J.W. continued to be a vulnerable adult after leaving RS Eden.

RS Eden's president, Dan Cain, testified as to RS Eden's philosophy, which involves helping clients become capable of and responsible for self-care. RS Eden's policy manual notes that "RS Eden provides recovery, accountability, and support services facilitating individual, family, and community movement from non-productive behavior to responsible, self-sufficient lifestyles."

Notably, Dr. Simon agreed that prescribing Clonidine is a reasonable course of action.