### MITCHELL TRANSPORT, INC. v. RAILROAD AND WAREHOUSE COMMISSION AND OTHERS.

137 N. W. (2d) 561.

August 13, 1965—No. 39,602.

*Robert W. Mattson,* Attorney General, *James D. Mason,* Special Assistant Attorney General, and *Ronald B. Pitsenbarger,* for appellants.

*Richard E. Kyle, Samuel H. Morgan, M. J. Galvin, Jr.,* and *Briggs & Morgan,* for respondent.

NELSON, JUSTICE.

Mitchell Transport, Inc., of Cleveland, Ohio, made application to the Railroad and Warehouse Commission of the State of Minnesota for a contract carrier permit to serve Lehigh Portland Cement Company of Allentown, Pennsylvania, in the transportation of cement from its cement storage terminal, which was then in the process of construction and has since been completed, in Burnsville, Minnesota, to all points in this state. The commission denied the application and Mitchell appealed to the district court, which reversed the action of the commission. The commission and four protestants appeal from the judgment of the district court.

Mitchell is in the business of transporting cement and operates exclusively on behalf of Lehigh between numerous points throughout the United States in both interstate and intrastate commerce. Lehigh's cement is transported from various processing plants throughout the country to its customers. Mitchell is on call to transport Lehigh's cement 24 hours a day, 7 days a week. Space is made available at the terminal for the storage of equipment, fuel, oil, tires, and parts necessary for the maintenance of Mitchell's equipment. The number of vehicles to be stored at the Burnsville terminal will be dependent upon the service required. Mitchell at the present time has approximately 400 tractors and 400-plus trailers hauling cement for Lehigh throughout the United States.

Lehigh has found increasing competition in recent years in the cement industry and has therefore concluded that it is necessary to provide better

service to its customers. One of the primary means of providing this service is to build distribution facilities in order that customers may have direct truck delivery where and when cement is needed. Lehigh has in the past experienced shortages of rail cars and has become fearful of shortages developing in trucks and for that reason it has decided to use one contract carrier which can devote its services and equipment exclusively to Lehigh's use. Before negotiating the carrier contract with Mitchell for deliveries to and from its Burnsville terminal, Lehigh did not negotiate with other carriers nor attempt to explore other carriers' rates of service. It is true that appellant trucking companies contacted Lehigh relative to delivery of the company's products. But Lehigh, because it had previously consummated its contract with Mitchell, did not enter into discussion as to trucking services with them. Appellant trucking companies are not engaged in contract delivery of cement but operate as irregular route common carriers.

It appears that no order was ever made granting any of the protestants, including those which appealed, the right to intervene in the proceeding before the commission. For that reason Mitchell moved for dismissal of protestants' appearances at the trial in district court, but no order was ever made by the district court in respect to the status of the protestants as parties. Further, the Railroad and Warehouse Commission, through the attorney general, did not appear in the district court proceedings until the motion for amended findings was made, although notice of appeal had been duly given to the attorney general pursuant to Minn. St. 555.11.

The Railroad and Warehouse Commission's regulations state (Minnesota Regulations, Title IX, 9211 [1960 ed.]):

"Complainants, applicants, petitioners, and respondents specifically named as such in any pleading are parties to the proceeding * * *."

In accordance with this regulation it would appear that the appellant trucking companies were only protestants and therefore not parties making their appearance before the commission; but even if they had been dismissed as parties below, the Railroad and Warehouse Commission was properly before the court below, and on this appeal it would appear that the issues raised by the commission are identical to those raised by the appellant trucking companies.

This case turns on the meaning of Minn. St. 221.121, subd. 1, which provides in part:

"Any person desiring to operate hereunder as a permit carrier * * * shall file a petition with the commission specifying the kind of permit desired, the name and address of the applicant, and the names and addresses of the officers, if a corporation, and such other information as the commission may require. The commission, after notice to interested parties and a hearing, shall issue the permit upon compliance with all laws and regulations relating thereto, *unless it finds that the area to be served has a sufficient number of permit carriers of the kind applied for to fully and adequately meet the needs of such area for the kind of transportation service applicant proposes to offer* or that applicants' vehicles do not meet the safety standards set up by the commission or that applicant is not fit and able to conduct the proposed operations * * *. A permit once granted shall continue in full force and effect until abandoned or unless suspended or revoked, subject to compliance by the permit holder with all applicable provisions of law and the rules of the commission governing permit carriers." (Italics supplied.)

"Permit carrier" is defined in Minn. St. 221.011(13) as follows:

" 'Permit carrier' means every carrier embraced within the provisions of this chapter other than regular route common carriers and petroleum carriers."

Other carriers embraced within the provisions of Minn. St. c. 221 and pertinent to this case are irregular route common carriers and contract carriers. Section 221.011(10) defines an "Irregular route common carrier" as —

"* * * any person who holds himself out to the public as willing to undertake to transport property from place to place over highways for hire but who does not operate between fixed termini or over a regular route or on regular time schedules."

Section 221.011(11) defines "Contract carrier" as —

"* * * any person engaged in the business of transporting property for hire over the highways under special contracts of carriage with the

shippers or receivers of freight who require a specialized service to meet their needs, or a carrier who limits his hauling to not more than ten customers."

■ It is the contention of appellants that in determining whether there are sufficient permit carriers to fully and adequately meet the needs of the area all permit carriers performing a transportation service similar to that performed by an applicant should be taken into consideration. Thus in the case at bar, even though Mitchell is a contract carrier only, it is appellants' contention that Mitchell should not be granted a permit if there are irregular route common carriers which can perform the services which Mitchell has contracted to perform. Appellants further contend that the legislature did not intend to limit the area of consideration to that of contract carriers when a contract carrier applies for a permit, even though it has said, "unless it [commission] finds that the area to be served has a sufficient number of permit carriers *of the kind applied for.*" (Italics supplied.) *There were no contract carriers who protested here.*

We think that the appellants have misconstrued the statute. It is necessary to examine the pertinent phrases, the first of which is: "permit carriers of the kind applied for." The term "permit carriers" by the statutory definition in § 221.011(13) includes several different types or classifications of permit carriers. Thus, "of the kind applied for" necessarily limits the consideration to the precise kind applied for, which, in this case, is contract carrier.

The next consideration is whether the phrase "kind of transportation service applicant proposes to offer" can be construed to contradict the earlier phrase "permit carriers of the kind applied for." Respondent contends that "transportation service" refers to the kind and availability of equipment, delivery schedules, and so forth and that it does not logically refer to carrier status, such as common or contract. Conversely, *"kind"* of *permit carrier,* it is claimed, can logically mean only *carrier status,* specifically the kinds of *carrier permits* which the commission has authority to issue, i. e., contract, irregular route common, interstate, or charter.

Appellants do not specifically answer respondent's assertion relative to the meaning of the term "transportation service" but only suggest that the statutory history bears out their contention that the commission must

examine the service proposed to be furnished by the applicant for a contract carrier permit. If the service is performed by other permit carriers, then it may deny the permit if it finds that other permit carriers performing this kind of transportation service exist in adequate numbers to fully and adequately meet the needs of the area for the type of transportation service proposed.

In 1957, Minn. St. c. 221, regulating motor carriers, was extensively rewritten. This legislation was apparently the result of a report submitted by an interim commission established in 1955 [1] to consider, among other things, the sufficiency of present regulations of carriers. Appellants emphasize the portion of the report which states (Report of the Commission to Study the Railroad and Warehouse Commission 1957, p. 27):

"* * * We feel that in cases where the commission finds there are a sufficient number of truckers in a territory to adequately meet the needs of the shippers there, it should have authority to deny applications."

However, the quoted statement is part of a paragraph which is concerned with under-financed operators, and it would appear that the reason authority to deny such applications is given to the commission is to alleviate the problems created by the entry into the field of such under-financed operators.

We reach the conclusion that the present statute requires a finding that the phrase "permit carriers of the kind applied for" can only mean permit carriers of the same kind as the applicant; here, contract carriers. It is clear that the different kinds of carriers referred to in § 221.121 are categories of carriers such as contract, irregular route common, or charter, and not types of transportation service, as indicated by the definitions in § 221.011. We think it equally clear that the phrase "kind of transportation service applicant proposes to offer" cannot be construed to contradict the earlier phrase "permit carriers of the kind applied for."

We cannot agree with the commission's construction of § 221.121 because it would improperly, and contrary to the meaning of the statute, convert contract carriers into common carriers and subject them to the

---

[1] L. 1955, c. 607.

convenience and necessity requirements of § 221.071, an effect unsupported by legislative intent. The language of § 221.121 does not encompass the requirements of "convenience and necessity." The legislative history we think clearly shows that § 221.121, subd. 1, was enacted to protect new applicants and not to insulate existing carriers against all further competition. Certainly, if § 221.121 were to be so construed as to give the Railroad and Warehouse Commission power to deny any permit merely in order to protect other carriers' business, questions concerning violations of the commerce clause of the United States Constitution and the due process clauses of both the United States and the Minnesota Constitutions would arise.

■ Mitchell has called attention in its brief to Minn. St. 15.0425, which provides that an administrative agency's order may be set aside if it is "[u]nsupported by substantial evidence in view of the entire record." We cannot escape the fact that no contract carrier appeared as a protestant in these proceedings and are bound to reach the conclusion from a reading of the record that there is no substantial evidence to support a finding that there were even a sufficient number of irregular route common carriers to fully and adequately meet the needs of the area for the kind of transportation service Mitchell proposes to offer to Lehigh.

We call attention to H. C. Gabler, Inc.—Cement From Md. and Pa. Counties, 86 M. C. C. 447, wherein consideration is given to the fact that Congress included contract carriers in the scheme of motor-carrier regulation. Commissioner Webb, dissenting in part, stated (86 M. C. C. 494):

"Contract carriers are not second-class carriers. They should not be prevented from satisfying the changing transportation requirements of basic industries. They should not be limited to bits and pieces of traffic in which common carriers have no interest. They have a special function to perform in our national transportation system. In considering that function in the light of the criteria embraced in section 209(b) of the act, the three-judge District Court in J-T Transport Co. v. United States, 185 F. Supp. 838 (W. D. Mo. 1960), reached the following conclusion:

" 'The statute now contemplates two forms of motor carrier service. And quite obviously and clearly, under the statute a contract carrier's permit cannot be limited and restricted to cases where no common carrier service is available. Now an element of shipper's service has been affirmatively recognized by Congress, and here it is quite clear that the proposed contract carrier service is designed to meet the distinct particular needs of Boeing and that in its operation it has met that need. Under the statute a shipper is entitled to have his distinct needs met. In carrying out this new philosophy of motor carrier service, Congress has clearly indicated that the Commission must recognize contract carrier service as a form of transportation applicable when the special needs of each service are considered, under the national transportation policy.

\* \* \* \* \*

" 'In the final analysis the Commission has the responsibility for determining what is best for the public interest and the national transportation policy, weighing the various criteria that Congress has provided. The most that the courts may require is that all relevant factors be weighed carefully and fairly, and in this case, that no application be brushed aside upon the ground that an existing carrier wishes to perform the service. Again we emphasize that under the present statutory scheme, the shipper, the contract carrier and the common carrier all have coordinate interests; that there are now at least two forms of motor carrier service entitled to equal recognition, and that the interests of each must receive a fair consideration in reaching a determination which is consistent with the public interest and the policy of Congress with reference to national transportation. [Pages 848-851]' "

The three-judge decision of the United States District Court in J-T Transport Co. v. United States (W. D. Mo.) 185 F. Supp. 838, was appealed to the United States Supreme Court. I. C. C. v. J-T Transport Co. 368 U. S. 81, 82 S. Ct. 204, 7 L. ed. (2d) 147. We think the language in that case is descriptive of a national transportation policy which is equally applicable to intrastate transportation. There it was clearly indicated that contract carriers should not be prevented from satisfying the changing transportation requirements of basic industries,

especially where the distinct needs of the shipper may be better served by the new service. See, In re Application of Paulson, 249 Minn. 236, 81 N. W. (2d) 875.

■ It is our opinion that the trial judge was correct when he stated in his memorandum:

"* * * We must give the Statute the ordinary and reasonable interpretation of the language used, and such construction can lead to only one conclusion, and that is that an application for a contract carrier permit must be granted, unless the Commission finds that the area to be served has a sufficient number of contract carriers to fully and adequately meet the needs of the area."

Since there was no allegation of sufficient contract carriers and no appearance by contract carriers as protestants, the commission's decision was in error as a matter of law and the trial court's conclusion must therefore be affirmed.[2]

■ Respondent filed a notice of review in conformance with Minn. St. 605.065 to obtain review of the trial court's action in amending its findings to eliminate the words "and ordering the said Commission to grant the permit requested by the petitioner." This refusal of the trial court to instruct the commission is assigned as error, and respondent requests this court to grant such relief, citing three cases as authority.[3] Appellants suggest that such relief is unnecessary and state in their brief:

"It must be assumed that the Commission will act promptly in granting the permit should appellant be unsuccessful in this appeal. There has not been the slightest suggestion that the Commission would require a new hearing, with new evidence, prior to granting the permit."

It will, we believe, suffice to say in the instant case that the administrative agency is bound by the court's decision on questions of law, and

---

[2] State ex rel. Spurck v. Civil Service Board, 226 Minn. 240, 32 N. W. (2d) 574.

[3] State ex rel. Spurck v. Civil Service Board, 226 Minn. 240, 32 N. W. (2d) 574; Ramberg v. District Court, 241 Minn. 194, 62 N. W. (2d) 809; Nationwide Corp. v. Northwestern Nat. Life Ins. Co. 251 Minn. 255, 87 N. W. (2d) 671, 73 A. L. R. (2d) 884.

that questions of fact and of policy are for administrative and not judicial determination. There appears to be no compelling reason why this court should enter a decree ordering the commission to act. Absent such circumstances this court will not interfere with the commission's regular administration of its affairs. The judgment is accordingly affirmed.

Affirmed.