GILDEA, Chief Justice.
*15 In this case we are asked to decide whether appellant Amanda Restorff committed maltreatment by neglect under the Maltreatment of Minors Act ("the Act"). Minn. Stat. § 626.556, subd. 2(g) (2018). The Commissioner of Human Services ("Commissioner") determined that Restorff committed maltreatment under the Act when a 3-year-old child wandered away from her daycare. On appeal, Restorff argues that the supervision she provided was appropriate and that the Commissioner misinterpreted the Act in finding her responsible for maltreatment. Because we conclude that the Commissioner misinterpreted the Act and failed to make necessary findings, we reverse and remand for additional fact finding and a revised agency decision consistent with this opinion.
FACTS
Amanda Restorff operates a daycare out of her home in Otsego. Before this appeal, Restorff had been licensed to run a daycare for 7 years; her license permitted her to care for up to 14 children at a time. On August 1, 2016, Restorff was caring for 12 children-4 of whom were under 5 years old. Restorff's license did not require that she have assistance in caring for this number of children, but on August 1 she did have help from her 13-year-old niece, Emma. Emma had taken online training before beginning work at the daycare and Restorff gave Emma instructions on supervising children.[1]
Three-year-old G.B. and his sister arrived at the daycare by 8:30 the morning of the incident. Restorff was preparing cereal, and the children were playing inside. Soon after G.B. and his sister arrived, Restorff helped the children put their shoes on in the garage and sent them to the backyard with Emma. The backyard is large-about an acre-and unfenced. But Restorff's license did not require that she have a fence or that she keep the children inside. Restorff testified that she would typically keep children younger than five on her deck, which has a gate, when they were outside. But, she explained, she did not do that on August 1 because she had help from Emma and because she was going to be in the house for such a brief period of time. Emma was pushing children on a swing set outside while Restorff finished getting breakfast ready back in the house. While Restorff was inside, the window by the kitchen sink and a nearby sliding-glass door were open. Both overlooked the backyard, and Restorff believed she could still see and hear all of the children while inside.
Around 8:45 a.m., Restorff finished preparing cereal for the children and brought it out to the deck. At this point, the children had been in the backyard for some amount of time between 1 to 20 minutes.[2]
*16 The cereal was distributed to the children, and Restorff realized that G.B. was missing when she discovered that there was an extra bowl. She began to search the yard, the garage, and the house, yelling out G.B.'s name.
Around 8:47 a.m., the sheriff's office received a call that G.B. had been found near the side of a road approximately 2½ blocks from Restorff's house. A deputy arrived on the scene at 8:51 a.m. G.B. told the deputy his name and said that he was looking for his mother. The woman who found G.B. told the responding deputy that she lived near the corner of County Road 39 and Page Avenue Northeast in Otsego. She heard semi-trucks honking as they passed by her house that morning, and, when she looked outside, she found G.B. standing near an address sign across the street. The woman went outside, picked G.B. up, and called the sheriff's office.
Back at Restorff's daycare, the search continued. Restorff called her father, who lived nearby, to search the neighborhood while she stayed at home and searched the house. Unable to find G.B., Restorff called 911 at 9:06 a.m. The 911 dispatcher told Restorff that someone had found G.B. and that he was with a deputy. The deputy brought G.B. back to Restorff's daycare a few minutes later.
With G.B. returned, Restorff called G.B.'s parents to inform them about the incident. They told her-for the first time-that G.B. had wandered off before and that they did not fault her for the incident. G.B.'s mother said the same to the deputy sheriff.
At approximately 9:45 a.m., Restorff reported the incident to her licensing worker. By the end of the day, the Minnesota Department of Human Services ("DHS") issued an order temporarily suspending Restorff's childcare license. Restorff initially appealed the temporary suspension but later withdrew that appeal.
With the temporary suspension in place, Wright County's health and human services and child protection departments began a joint investigation. They interviewed Restorff, Emma, and G.B.'s father. After completing its investigation, Wright County determined that Restorff was responsible for maltreatment. In a letter to Restorff, Wright County explained that "a preponderance of the evidence ... shows that a child was found .3 miles from the daycare facility unattended." Restorff requested reconsideration, and Wright County affirmed its maltreatment determination.
In addition to the maltreatment determination, Restorff's license remained suspended for several months as she worked with Wright County to install additional safeguards in her home. In November, Restorff prepared a "wandering prevention plan" in which she promised to voluntarily install a fence in her yard, amend her supervision policies, and enroll in a training course on supervision. By December 9, 2016, Restorff had put up a temporary fence around a portion of her yard, agreed to put a permanent fence in the yard once the ground thawed, completed a 2-hour course on supervision, and amended her supervision policies. Satisfied with these additional safeguards, DHS issued an order lifting the temporary suspension but placed conditions on Restorff's license for two years and imposed a $1,000 fine.
Restorff appealed Wright County's maltreatment determination and DHS's order *17 imposing conditions on her license and a fine. Under Minn. Stat. § 245A.08, subd. 2a(a) (2018) and Minn. Stat. § 626.556, subd. 10i(f) (2018), an administrative law judge ("ALJ") held a contested-case hearing on March 15, 2017. At the hearing, Restorff testified that, before the incident in question, she had never received a license suspension or been found responsible for maltreatment. She also explained that she had never had a child wander away from her daycare before this incident. In addition to Restorff's testimony, 11 parents who planned to or had previously sent their children to Restorff's daycare-including G.B.'s mother-testified or wrote letters endorsing the quality of Restorff's daycare. Two people who had known Restorff for an extended period of time also submitted letters in the administrative proceeding endorsing Restorff's honesty and integrity.
The ALJ issued a recommendation to the Commissioner of Human Services that the sanctions be affirmed. Specifically, the ALJ recommended that Restorff's maltreatment determination be affirmed because she failed to "provide for necessary supervision or child care arrangements appropriate for a child" as required by Minn. Stat. § 626.556, subd. 2(g)(3). To reach this conclusion, the ALJ imported the definition of "supervision" from the daycare licensing rules. Those rules define "supervision" as "being within sight or hearing" of a child G.B.'s age "at all times so that the caregiver is capable of intervening to protect the health and safety of the child." Minn. R. 9502.0315, subp. 29a (2017). The ALJ concluded that Restorff was not within sight or hearing of G.B. "from the time he left [Restorff's] yard until the time he was returned to her care by a deputy sheriff," and, therefore, Restorff "failed to supervise" G.B as required by the Act.
The Commissioner issued a final agency decision adopting the ALJ's recommendation but using a different analysis. The Commissioner characterized the maltreatment issue as "whether the supervision level was appropriate" for G.B. under the factors listed in Minn. Stat. § 626.556, subd. 2(g)(3). She determined that Restorff's supervision level was inappropriate for G.B. "because G.B. was able to wander away without [her] knowledge." In addition, the Commissioner adopted the definition of "supervision" from the licensing rules and concluded that because G.B. was able to leave the daycare, he "was either not within [Restorff's] sight or hearing, or [Restorff] was not capable of intervening while G.B.'s elopement from [Restorff's] yard was in progress." Thus, while both the ALJ and the Commissioner used a strict-liability analysis, the ALJ determined that Restorff failed to supervise G.B. because she could not see or hear him after he left the backyard, and the Commissioner determined that Restorff must have failed to supervise G.B. because he was able to leave the backyard.
Restorff petitioned the court of appeals for review by a writ of certiorari. The court of appeals affirmed. In re Maltreatment Determination of Restorff , No. A17-1433, 2018 WL 1997186 (Minn. App. Apr. 30, 2018). In doing so, the court of appeals, like the ALJ and the Commissioner, used the definition of "supervision" from Rule 9502.0315. The court of appeals adopted the ALJ's reasoning and concluded that, under the definition in the rule, Restorff needed to be within sight or hearing of G.B. "at all times," and that "G.B. was likely outside of Restorff's sight or hearing for at least 25 minutes" from the time he left the backyard until he was returned to the daycare. Id. at *3.
*18 We granted Restorff's petition for review of the maltreatment determination.[3] On appeal, Restorff argues that the Commissioner misinterpreted and misapplied the Maltreatment of Minors Act in finding her responsible for maltreatment. Specifically, she argues that the language "to provide for necessary supervision" under Minn. Stat. § 626.556, subd. 2(g)(3), requires caregivers to make and execute a plan for a child's supervision, not guarantee "a fail-safe supervisory system." Otherwise, according to Restorff, "every parent in this state, as well as every licensed daycare provider, who has ever had a child stray out of sight or hearing while under their supervision [will be liable] for maltreatment by neglect." The Commissioner contends that she properly interpreted and applied the Act, and she urges us to affirm the determination of maltreatment.
ANALYSIS
This case involves the safety of a young child who wandered away from his caregivers. Although the child was not injured, that fortuity does not change the seriousness of the situation. This case also comes to us against the backdrop of a marked increase in the number of reports of child maltreatment and increased scrutiny of the work caregivers and government officials alike perform.[4] While these developments should provide incentives to caregivers and government officials to ensure all reasonable steps are taken to protect children, they do not alter the controlling legal standards or the responsibility of Minnesota's courts to ensure that those standards are met. To that end, the Administrative Procedure Act controls our review in this case.
Under the Administrative Procedure Act, we may reverse or modify an agency decision if it is, among other things, affected by an error of law or unsupported by substantial evidence. Minn. Stat. § 14.69 (2018). In addition, we may remand the case for additional fact finding if the agency's findings are insufficient. In re A.D. , 883 N.W.2d 251, 258 (Minn. 2016). Agency decisions enjoy a presumption of correctness that warrants deference by courts. In re Appeal by Kind Heart Daycare, Inc. v. Comm'r of Human Servs. , 905 N.W.2d 1, 9 (Minn. 2017). But when confronted with questions of law, our review is de novo. Id. Whether an agency decision is supported by substantial evidence is a question of law, Webster v. Hennepin County , 910 N.W.2d 420, 428 (Minn. 2018), as are questions of statutory interpretation, In re A.D. , 883 N.W.2d at 256.
I.
Restorff argues that the Commissioner misinterpreted the Maltreatment of Minors Act in finding her responsible for maltreatment. The Act requires, among other things, that local welfare agencies investigate reports of maltreatment in child care programs and make determinations as to whether maltreatment occurred. Minn. Stat. § 626.556, subds. 3c(a), 10e(c) (2018). Maltreatment includes physical abuse, sexual abuse, mental injury and neglect. Id. , subd. 10e(f). The Act specifically *19 defines each of these terms, but only "neglect" is at issue here.
The definition of "neglect" includes nine clauses that set out qualifying acts and omissions. See id. , subd. 2(g)(1)-(9). Restorff was found to have violated clause 3. Id. , subd. 2(g)(3) ("Clause 3"). Clause 3 defines "neglect" as the failure by a person responsible for a child's care:
to provide for necessary supervision or child care arrangements appropriate for a child after considering factors as the child's age, mental ability, physical condition, length of absence, or environment, when the child is unable to care for the child's own basic needs or safety, or the basic needs or safety of another child in their care.
To determine whether the Commissioner's maltreatment determination was proper under Clause 3, we must interpret three distinct elements: (1) the effect of "provide for;" (2) what "necessary supervision" entails; and (3) what it means for supervision to be "appropriate for a child" under the listed factors.
Our statutory interpretation starts with the "plain and ordinary meaning" of the terms. Emerson v. Sch. Bd. of Indep. Sch. Dist. 199 , 809 N.W.2d 679, 682 (Minn. 2012).[5] In the absence of statutory definitions, we often look to dictionary definitions to determine the plain meaning of a statute's terms. In re A.D. , 883 N.W.2d at 256. In addition, we consider a statute "as a whole so as to harmonize and give effect to all its parts." Van Asperen v. Darling Olds, Inc. , 254 Minn. 62, 93 N.W.2d 690, 698 (1958).
A.
We begin with an interpretation of "provide for." The parties agree that to "provide for" supervision means to create and execute a plan for a child's supervision. According to Restorff, to provide for something "reflects an element of advance preparation." She argues that the presence of "child care arrangements" in Clause 3 further supports this interpretation because an "arrangement" is also a plan or agreement to do something in the future. The Commissioner agrees with Restorff's interpretation and concedes that Restorff implemented a plan for G.B.'s supervision on August 1. But the Commissioner argues that "the supervision plan upon which [Restorff] relied was insufficient given the circumstances at her family child care program at the time of the incident." (Emphasis added).
We agree with the parties that to "provide for" supervision means to make and execute a plan for supervision. The dictionary definition of "provide" is "[t]o make available," "[t]o supply something needed or desired," or "[t]o take[ ] measures in preparation." The American Heritage Dictionary of the English Language 1418 (5th ed. 2011). As an example of "provide" being used to signify taking measures in preparation, the dictionary gives the phrase "provide[ ] for the common defense." Id. Accordingly, under the plain and ordinary meaning of "provide for," Clause 3 requires a caregiver to create and execute a plan for a child's supervision. Such a definition contemplates that a parent or childcare provider might directly supervise a child or delegate that task to another individual. In either situation, the caregiver is providing for supervision.
B.
We next consider the term "necessary supervision." Clause 3 states that supervision *20 is necessary "when the child is unable to care for the child's own basic needs or safety, or the basic needs or safety of another child in their care." Minn. Stat. § 626.556, subd. 2(g)(3). But the Act does not contain a specific definition of "supervision."
The ALJ, the Commissioner, and the court of appeals all imported the definition of "supervision" from the daycare licensing rules to determine what the term means under the Act. DHS promulgated the daycare licensing rules, and they define supervision as "a caregiver being within sight or hearing of an infant, toddler, or preschooler at all times so that the caregiver is capable of intervening to protect the health and safety of the child." Minn. R. 9502.0315, subp. 29a. Based on that definition, all three decision-makers below determined that Restorff failed to provide for necessary supervision of G.B.
The ALJ and the court of appeals reached this conclusion by reasoning that G.B. was out of sight of both Restorff and Emma and could not be heard from the time he left the backyard until he was returned to the daycare. The Commissioner's final agency decision, on the other hand, found that Restorff failed to provide for supervision by applying a presumption: because G.B. wandered away without Restorff's knowledge, he "was either not within [Restorff's] sight or hearing, or [Restorff] was not capable of intervening while G.B.'s elopement from [Restorff's] yard was in progress."
Using the daycare licensing rules to define supervision under the Act was improper. Under our principles of statutory interpretation, we look to an outside statute or rule like Rule 9502.0315 only when a statute is ambiguous, see State v. Thonesavanh , 904 N.W.2d 432, 437-38 (Minn. 2017) (explaining the in pari materia canon of construction), or when a word is a technical term with a special meaning, see Minn. Stat. § 645.08(1) (2018). Neither condition exists here.
In addition, we look to the statutory or regulatory definition of a word only when that definition is applicable. See Wayzata Nissan, LLC v. Nissan N. Am., Inc. , 875 N.W.2d 279, 286 (Minn. 2016) ("When there is no applicable statutory definition, we often consult dictionary definitions to discern a word's plain meaning." (emphasis added)); see also Jaeger v. Palladium Holdings, LLC , 884 N.W.2d 601, 605 (Minn. 2016) ("When a statute or a rule does not contain a definition of a word or phrase, we look to [dictionary definitions] ...." (emphasis added)). The daycare licensing rules are not in chapter 626 or incorporated by Clause 3. And, more importantly, the daycare licensing rule at issue explicitly states that it applies only to other daycare licensing rules. Minn. R. 9502.0315, subp. 1 (2017) ("As used in parts 9502.0315 to 9502.0445, the following terms have the meanings given them.").[6] Thus, the Commissioner erred in importing the daycare licensing rules to ascertain the plain meaning of "supervision" in Clause 3.[7]
*21 Because there is no applicable statutory definition of "supervision," we look to dictionary definitions. Wayzata Nissan, LLC , 875 N.W.2d at 286. "Supervision" is defined as "[t]he act, process, or function of supervising." The American Heritage Dictionary of the English Language 1750 (5th ed. 2011). "Supervise," in turn, means "[t]o manage and direct; be in charge of." Id. A close synonym of supervision is "care," id. , which means, in relevant part, "watchful oversight," id. at 281. Using these definitions, "supervision" under Clause 3 requires that caregivers provide for watchful oversight of children in their care.
C.
The final issue of statutory interpretation is what it means for supervision to be "appropriate." Clause 3 requires that caregivers provide for supervision that is "appropriate for a child after considering factors [such] as the child's age, mental ability, physical condition, length of absence, or environment." This language requires the Commissioner to conduct a fact-specific examination of all of the circumstances present to determine whether the supervision plan was appropriate in the abstract and whether the plan was executed appropriately in the specific context at issue.
In sum, Clause 3 requires that a caregiver create and execute a plan for a child's supervision. That supervision must include the provision of all watchful care that is necessary and appropriate under the circumstances, including consideration of the specific factors listed in Clause 3. The Act does not impose a mechanical definition of what this supervision must look like but instead requires that the plan be appropriate under the listed factors. With this interpretation in mind, we must decide whether substantial evidence in the record supports the Commissioner's determination that Restorff committed maltreatment by neglect under Clause 3.
II.
The substantial evidence standard requires "more than a scintilla of evidence, more than 'some' evidence, and more than 'any' evidence." Webster v. Hennepin County , 910 N.W.2d 420, 428 (Minn. 2018). It is such evidence "that a reasonable person would accept as adequate to support a conclusion." In re A.D. , 883 N.W.2d 251, 259 (Minn. 2016).
Here, the record shows that Restorff created and executed a plan for supervision on the morning of August 1. Under this plan, Emma, Restorff's helper, supervised 12 children in an unfenced backyard while Restorff was within earshot inside the house. Restorff and Emma followed this plan for some time between 1 and 20 minutes before Restorff joined Emma and the children outside. In creating and executing the plan, Restorff did not know that G.B. had a propensity to wander and had never had a child wander away from her large backyard before.
The decision-makers below did not conduct a fact-specific examination of these circumstances to determine whether Restorff's supervision plan was appropriate.
*22 Instead, they each adopted the definition of supervision from the daycare licensing rules and applied that rule to conclude that Restorff failed to provide supervision. But Clause 3 requires an assessment of whether the supervision was appropriate given the circumstances.
The Commissioner's final decision came closest to an appropriateness analysis when she said, "[t]he issue is whether the supervision level was appropriate given G.B.'s age, his mental ability, and his being permitted in the unfenced back yard when [Restorff] was not present outdoors." But the Commissioner followed that issue statement with the conclusory determination that Restorff's "supervision of G.B. was not adequate because G.B. was able to wander away without [Restorff]'s knowledge and [Restorff] was incapable of intervening." Instead of analyzing the relevant factors listed in Clause 3, the Commissioner found that Restorff's supervision plan was automatically inappropriate because G.B. was able to wander. This strict-liability analysis is erroneous because it is not what the Act requires. As Restorff argues, such an interpretation would make every caregiver who has a child wander liable for maltreatment regardless of the particulars of their supervision plan or the incident.[8]
Although the Commissioner erred when she misinterpreted the statute, we may not reverse the final agency decision if substantial evidence in the record supports her ultimate determination. See Webster , 910 N.W.2d at 430 (noting that the Administrative Procedure Act instructs reviewing courts to consider "all evidence in the record, not just the evidence formally relied on by the [agency]"). With the benefit of hindsight, one can see how Restorff's supervision plan may have been inadequate. Watching 12 children is difficult, especially in a space without physical boundaries and when there is only one person fully committed to watching those children.
*23 But if Restorff was inside only for a brief period, her supervision plan could be appropriate under the factors. After all, Restorff's helper was with the children outside. Restorff was not aware of G.B.'s propensity to wander and had never had a child wander away from her backyard before.[9] Moreover, a window and door were open so that Restorff could hear if something happened or if Emma called.
In our view, the most important factor to the appropriateness analysis in this case is the amount of time Restorff was inside while the children were outside with Emma. This specific fact, however, is missing from the final agency decision. Neither the ALJ nor the Commissioner made a factual finding as to how long the children were outside without Restorff. In addition, the record offers a variety of possibilities as to how long the children were outside. These timelines range from 1 to 20 minutes, and it is unclear which of these is correct. Even the Commissioner is inconsistent in her brief to our court on the issue. In some places, the Commissioner says that the children went outside at "approximately 8:40 a.m.," which would mean that, based on the final agency decision, the children were outside for 5 minutes without Restorff. At other places in her brief, however, the Commissioner claims that Emma "was outside alone with the children for 10-15 minutes while [Restorff] prepared breakfast."
In her final agency decision, the Commissioner says that it does not matter whether "the time frame that [Restorff] was actually indoors was closer to 10 minutes, 5 minutes, or 3 minutes." According to the Commissioner, under any of these time frames, "it was reasonably foreseeable that this child care arrangement was insufficient to provide the supervision necessary for a preschool-age child, such as G.B." We disagree.
Clause 3 specifically directs us to consider the "length of absence" in determining whether supervision was appropriate. Minn. Stat. § 626.556, subd. 2(g)(3). It is one thing for a caregiver to step away from her wards for a brief period of time to complete other necessary tasks. It is another thing entirely to leave children alone for long periods of time with a single young supervisor. In other words, the length of the absence matters.[10]
But we are missing a factual determination on the length of Restorff's absence-a fact that is both material in this case and *24 explicitly called for by the Act. And we cannot make a factual finding on this issue ourselves. See, e.g. , Gibson v. Civil Serv. Bd. , 285 Minn. 123, 171 N.W.2d 712, 715 (1969) ("The functions of fact-finding, resolving conflicts in the testimony, and determining the weight to be given to it and the inferences to be drawn therefrom rest with the administrative board."); Mitchell Transp., Inc. v. R.R. & Warehouse Comm'n , 272 Minn. 121, 137 N.W.2d 561, 567 (1965) ("[Q]uestions of fact and of policy are for administrative and not judicial determination."); Morey v. Sch. Bd. of Indep. Sch. Dist. No. 492, Austin Pub. Schs. , 271 Minn. 445, 136 N.W.2d 105, 108 (1965) ("[M]aking findings of fact is the obligation of the administrative body and is not a function to be performed by the court in the first instance.").[11]
Under our jurisprudence, when an "agency's findings are insufficient, 'the case can be either remanded for additional findings or reversed for lacking substantial evidence supporting the decision.' " In re A.D. , 883 N.W.2d at 258 (quoting Dokmo v. Indep. Sch. Dist. No. 11, Anoka-Hennepin , 459 N.W.2d 671, 675 (Minn. 1990) ). Remand "is appropriate 'to permit further evidence to be taken or additional findings to be made in accordance with the applicable law.' " Id. (quoting Dokmo , 459 N.W.2d at 675 ). Here, the length of time the children were outside without Restorff is an important fact that we cannot determine on our own. In addition, the Commissioner was without the benefit of the interpretation we announce today in making her final agency decision. Accordingly, we remand[12] to the Commissioner *25 for additional fact finding and a revised agency decision.[13]
CONCLUSION
For the foregoing reasons, we reverse the decision of the court of appeals and remand to the Commissioner for additional fact finding and a revised agency decision.
Reversed and remanded
Dissenting, Hudson, J.
DISSENT

Under the Department's day-care licensing rules, Emma qualifies as a "helper," because she was "at least 13 years of age." Minn. R. 9502.0315, subp. 14 (2017) (defining "helper"). And, because she was a "helper" under the rules, Emma also falls within the definition of "caregiver" under the licensing rules. Id. , subp. 6 (defining "caregiver").

The Commissioner did not make a factual finding on how long the children were outside without Restorff. The final agency decision finds only that G.B. arrived by 8:30 a.m. and that Restorff brought breakfast outside around 8:45 a.m. It does not specify what time the children went outside during that 15-minute span. In addition, the record offers a variety of possibilities on how long the children were outside. Restorff testified at a hearing before an administrative law judge that the children were outside without her for "literally [ ] just two minutes maybe" or "[o]ne to three minutes maybe max." In an interview with social workers, Restorff said that the children went outside around 8:35 a.m. and that she brought the cereal out by 8:42 a.m. And, under the longest timeline, Emma testified that she was outside with the children without Restorff for "probably about 15, 20 minutes."

On appeal, Restorff does not challenge the conditions that were placed on her license or the Commissioner's authority to impose a fine. At oral argument, however, she noted that the amount of the fine should be reduced if the maltreatment determination is reversed. See Minn. Stat. § 245A.07, subd. 3(c)(4) (2018) (permitting childcare license holders to be fined $1,000 each time they receive a maltreatment determination and $200 for each violation of the supervision rules). We agree. The Commissioner shall adjust Restorff's fine if necessary on remand.

See dissent infra at 27-28, nn. 3-5.

Neither party contends that the Act is ambiguous as applied here, and we likewise see no ambiguity in the language at issue.

The dissent relies on the definition of "supervision" from the rule and asserts that an "air of unreality" permeates our discussion because we do not import the definition of supervision from the daycare licensing rules. But the Maltreatment of Minors Act regulates not just daycare facilities but parents, guardians, teachers, coaches, and school employees and agents. See Minn. Stat. § 626.556, subd. 2(j). If the dissent were correct in importing the rule's definition of "supervision" into the Act, every parent who has had a child wander away for few minutes would have committed maltreatment.

In a separate part of the Act, the Legislature did specifically incorporate the licensing rules. Subdivision 2(a) of the Act defines which incidents can be deemed "accidental." Under that subdivision, if an incident occurs when a child is receiving services from a childcare facility, the incident can be deemed an accident only if "the facility ... [is] in compliance with the laws and rules relevant to the occurrence or event." Minn. Stat. § 626.556, subd. 2(a)(2). Because this definition explicitly incorporates the "laws and rules relevant to the occurrence or event," courts can look to the daycare licensing rules to determine whether a facility is in compliance with them. Clause 3, by contrast, does not incorporate other rules or statutes to which daycare providers are subject. See id. , subd. 2(g)(3).

According to the dissent, the Commissioner conducted a fact-specific analysis, rather than a strict-liability analysis, because she listed several factors before stating her determination. This conclusion is contrary to the substance of the Commissioner's decision. Although the Commissioner did, as the dissent asserts, state that "[t]he issue is whether the supervision level was appropriate given G.B.'s age, his mental ability, and his being permitted in the unfenced back yard when [Restorff] was not present outdoors," the Commissioner did not use these facts to reach her decision. Instead, the Commissioner determined that Restorff's "supervision of G.B. was not adequate because G.B. was able to wander away. " (Emphasis added.) After discussing the daycare licensing rules, the Commissioner reiterated that Restorff did not provide appropriate supervision "[b]ecause G.B. was able to wander away without [Restorff's] knowledge."
The dissent highlights one statement by the Commissioner where she says that "because G.B. as a child under 4 years of age did not have the mental capacity to appreciate the danger of leaving the confines of the back yard and walking toward a busy street, [Restorff] did not provide the necessary supervision to G.B. on August 1." But reading the Commissioner's decision as a whole shows that she merely recited factors but did not use them in reaching her decision. The statute requires the factfinder to consider the child's age, the child's mental ability and physical condition, the length of Restorff's absence, the child's environment, and any other relevant factors. At most, the quote the dissent uses shows that the Commissioner considered the fact that G.B. was 3 years old and had the mental ability of a typical 3-year-old. She clearly did not, however, consider the length of Restorff's absence, the fact that Restorff did not know that G.B. had wandered away from his parents before, or the fact that Restorff had never had a child wander from her daycare before. The Commissioner's conclusory statements regarding a few of the relevant factors are not sufficient under the statute and do little to mask the true rationale underlying her decision: any time children wander away, their caregivers have committed maltreatment by neglect.

The dissent contends that Restorff must have known that G.B. would wander away because everybody knows that children wander. But the fact that children sometimes wander does not mean that a child's caregiver commits maltreatment every time that child wanders. As we explain above, there is no statutory authority for the strict-liability standard that the dissent, the court of appeals, the Commissioner, and the administrative law judge adopted. Instead, the Act requires that we examine whether the caregiver's supervision of the child is appropriate under all the facts and circumstances of the case. Further, Restorff did not allow G.B. "to roam outside unattended" as the dissent suggests. Restorff testified that she allowed G.B. to go outside without her and did not keep him on her gated deck because Emma was supervising the children outside.

The dissent questions "whether we would be here parsing 5-10 minute increments if G.B. had been hit and killed by a semi-truck ... that morning." The Act, however, specifically requires that this factor be examined. Minn. Stat. § 626.556, subd. 2(g)(3). Contrary to the dissent's suggestion, the Act does not key a maltreatment-by-neglect determination on the consequences, if any, a child suffers due to the caregiver's failure to supervise. And rightly so, because maltreatment by neglect can occur from the creation of a risk for harm, which is the issue here, just as it can occur when harm is actually suffered. The legal analysis is the same in both circumstances.

The dissent disregards this well-established principle in concluding that "there is substantial evidence in the record to support the Commissioner's determination that the supervision was not appropriate." According to the dissent, the children were outside between 3 and 10 minutes and Emma "was playing with some of the children on the swing set" but "was apparently unaware of the activities of the others." This judicial fact-finding is inappropriate. See Morey , 136 N.W.2d at 108.
The final agency decision does not state, as the dissent asserts, that some of the children "were left unattended" while Emma was pushing others on a swing set. In fact, Emma testified that she was not distracted when she was with the children and that she had been doing head counts while outside that morning. As for the time that the children went outside, the record contains multiple conflicting possibilities. It is not our role to resolve conflicts in the record, determine the weight to give certain evidence, or draw inferences from the evidence. Gibson , 171 N.W.2d at 715. In circumstances like this where the record conflicts and certain inferences have not been drawn by the administrative body below, we cannot choose a side or draw our own inferences.
Further, in concluding that the Commissioner met her burden, the dissent fails to appreciate other facts in the record. For example, DHS licensed Restorff's daycare facility knowing that her backyard was unfenced, and its rules allowed her to care for the 12 children at her daycare that morning without the help of another caregiver. If the conditions at Restorff's daycare were so obviously inappropriate that a maltreatment determination is warranted, which is the approach the dissent takes, it is, at best, odd that DHS approved of these conditions in issuing Restorff a license.

After oral argument, Restorff filed a citation of supplemental authority with our court. She claims that our recent decision in another maltreatment-by-neglect case in which we reversed the Commissioner's maltreatment determination informs the appropriate remedy in this case. See In re Appeal by RS Eden/Eden House of the Determination of Maltreatment & Order to Pay a Fine , 928 N.W.2d 326 (Minn. 2019). RS Eden involves the Vulnerable Adults Act and focuses on a caregiver's responsibility to supply vulnerable adults with care and services, rather than supervision. Our decision to reverse the maltreatment determination in RS Eden was based on a total lack of evidence supporting that determination. Id. at 335-36. Accordingly, RS Eden is of no help here.

In her final agency decision, the Commissioner determined that G.B.'s wandering was not accidental under the Act. Whether an incident was accidental, however, is only relevant if maltreatment occurred. See Minn. Stat. § 626.556, subd. 2(g) (" 'Neglect' means the commission or omission of any of the acts specified [below], other than by accidental means."). Because we remand the maltreatment issue to the Commissioner, we do not reach the question of whether G.B.'s wandering was accidental.