*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0976**

In the Matter of the Appeal by Sheena Haack of the Order of License Revocation.

**Filed May 6, 2024
Affirmed
Reyes, Judge**

Minnesota Department of Human Services, OAH
File No. 60-1800-37980

Katherine S. Barrett Wiik, Douglas D. Anderson, Saul Ewing, LLP, Minneapolis, Minnesota (for relator Sheena Haack)

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Justin R. Anderson, Grant County Attorney, Elbow Lake, Minnesota (for respondent Minnesota Department of Human Services)

Considered and decided by Larson, Presiding Judge; Reyes, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**REYES**, Judge

In this certiorari appeal, relator challenges an order by respondent Minnesota Department of Human Services (DHS) determining that relator committed maltreatment by neglect and imposing conditions on relator's child-care license. We affirm.

**FACTS**

The facts are undisputed. Beginning in 2014, relator Sheena Haack operated a family-child-care program in the rural, western Minnesota town of Hoffman. On June 23, 2021, Haack was caring for ten children between the ages of 23 months and eight years

old. After returning from a bike ride with the children, Haack gave them water and a bathroom break. Haack had food for the children's lunch, but they asked for noodles, which she did not have. Haack decided to go across the street to a grocery store to purchase noodles. She grabbed her video/audio monitor and left the children alone in the home. The store is located approximately 80 feet from Haack's child-care home. As Haack reached the front door of the store, a licensor from Grant County Social Services (the county) made an unannounced relicensing visit to Haack's child-care home. Haack immediately turned around and met the licensor at the front door of the home.

After inspecting the child-care home, the county licensor informed Haack that there were supervision and licensing violations that the county would refer to DHS to determine whether discipline was appropriate. That same day, the county licensor filed a child-protection report, and DHS issued a temporary immediate suspension order of Haack's child-care license.

During a subsequent interview with the county licensor, Haack admitted that she had left the children alone to go to the store on June 23. Following its investigation, the county determined that Haack committed maltreatment by neglect by leaving the children unattended while going to the store. The county denied Haack's request for reconsideration, and Haack appealed by requesting a fair hearing from DHS.

On November 5, DHS followed the county's recommendation to revoke Haack's license after determining that she had knowingly withheld or provided false or misleading information during the county's investigation, committed maltreatment, and failed to

comply with multiple licensing laws and rules. Haack appealed the license revocation, and the matter was consolidated with her appeal of the county's maltreatment determination.

At a contested-case hearing in May 2022, an administrative-law judge (ALJ) heard testimony from the county licensor, a child-protection social worker, a parent who had used Haack for child care, a substitute provider at Haack's child-care home, and Haack. The ALJ subsequently determined that the county had failed to prove by a preponderance of the evidence that Haack had committed maltreatment by neglect and had failed to demonstrate reasonable cause to believe that she had committed most of the alleged licensing violations. The ALJ recommended that the commissioner for DHS (the commissioner) rescind the county's maltreatment determination, vacate Haack's license revocation, and impose a correction order for her remaining licensing violations. Although the ALJ noted that the underlying allegation that Haack had left the children unattended was serious, it identified "problems with the [county's] investigation," including that the county did not interview key witnesses and ignored facts supportive of Haack.

DHS filed exceptions to the ALJ's recommendation, arguing that it had established by a preponderance of the evidence that Haack committed maltreatment by neglect and that it had demonstrated reasonable cause to believe that Haack had violated licensing-supervision requirements. The commissioner issued a final order in January 2023. The commissioner adopted the ALJ's findings of fact, determined that Haack committed maltreatment by neglect, rescinded most of the county's licensing violations, affirmed a licensing violation related to safety hazards involving the child-care home's steps, and

3

rescinded the revocation of Haack's license. The commissioner ordered Haack to operate with a conditional license for one year and denied Haack's request for reconsideration.

Haack petitioned by writ of certiorari.

**DECISION**

Haack alleges that the commissioner's (1) determination that she committed maltreatment by neglect is based on their misapplication of the law, lacks the support of substantial evidence, and is arbitrary and capricious and (2) imposition of a conditional license lacks the support of substantial evidence. We disagree.

The Minnesota Administrative Procedure Act, Minn. Stat. §§ 14.001-.69 (2022) (MAPA), governs our review of administrative decisions following contested-case hearings. Minn. Stat. § 14.63. Under MAPA, we may affirm or remand, or may reverse or modify the agency's decision "if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are: . . . (d) affected by other error of law; or (e) unsupported by substantial evidence in view of the entire record as submitted; or (f) arbitrary or capricious." Minn. Stat. § 14.69 (d)-(f). Generally, "[a]dministrative agency decisions enjoy a presumption of correctness." *In re RS Eden/Eden House*, 928 N.W.2d 326, 332 (Minn. 2019) (quotation omitted).

**I. The commissioner's determination that Haack committed maltreatment by neglect is supported by substantial evidence and is not arbitrary or capricious.**

Haack argues that the commissioner erred as a matter of law by determining that she committed maltreatment by neglect because they misinterpreted and misapplied the Maltreatment of Minors Act, Minn. Stat. §§ 260E.01-.38 (2022 & Supp. 2023) (MMA),

4

and *In re Restorff*, 932 N.W.2d 12 (Minn. 2019), and imposed their will rather than their judgment because Haack (1) had a plan of direct supervision in place; (2) provided necessary supervision by use of the monitor; and (3) appropriately supervised the children in her care. We are not persuaded.

When confronted with questions of law, such as statutory interpretation, an appellate court's review is de novo. *Restorff*, 932 N.W.2d at 18; *Webster v. Hennepin Cnty.*, 910 N.W.2d 420, 428 (Minn. 2018). The "substantial evidence standard requires more than a scintilla of evidence, more than some evidence, and more than any evidence," and "is such evidence that a reasonable person would accept as adequate to support a conclusion." *Restorff*, 932 N.W.2d at 21 (quotations and citations omitted). Appellate courts must analyze whether the agency has explained adequately how it reached its determination and whether the record reasonably supports that determination. *Pfoser v. Harpstead*, 953 N.W.2d 507, 514 (Minn. 2021).

"An agency's decision is arbitrary or capricious if it represents the agency's will and not its judgment." *In re Waters*, 977 N.W.2d 874, 885 (Minn. App. 2022) (quotation omitted). To determine whether an agency's decision is arbitrary or capricious, appellate courts must consider whether, in making its decision, the agency

> (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006) (*CARD*). When a commissioner rejects an ALJ's recommendations,

"[t]he commissioner must articulate a rational connection between the facts found and the choice made." *Waters*, 977 N.W.2d at 886.

The MMA aims to "protect children and promote child safety" and "make the home, school, and community safe for children by promoting responsible child care in all settings, including through the reporting of child maltreatment." Minn. Stat. § 260E.01. The MMA requires local welfare agencies to investigate allegations of maltreatment in family child care. Minn. Stat. § 260E.14, subd. 1(a). After an investigation, the commissioner must determine whether maltreatment occurred based on a preponderance of the evidence. Minn. Stat. § 260E.30, subd. 2(a).

Here, the commissioner found that Haack had committed "maltreatment," Minn. Stat. § 260E.03, subd. 12(2), by "neglect" by failing

> to provide for necessary supervision or child care arrangements appropriate for a child after considering factors as the child's age, mental ability, physical condition, length of absence, or environment, when the child is unable to care for the child's own basic needs or safety, or the basic needs or safety of another child in their care.

*Id.*, subd. 15(a)(3).[1]

*Restorff* guides our analysis here. In *Restorff*, the supreme court held that "[w]hether a caregiver has committed maltreatment by neglect . . . is a fact-specific determination that must be made based on an examination of the totality of the circumstances." 932 N.W.2d at 14. To evaluate the commissioner's maltreatment determination, the supreme court

---

[1] The legislature amended Minn. Stat. § 260E.03, subd. 15(a) in 2023, but the amendment does not impact subdivision 15(a)(3).

focused on three elements of the definition of "neglect" under Minn. Stat. § 260E.03, subd. 15(a)(3): "(1) the effect of 'provide for;' (2) what 'necessary supervision' entails; and (3) what it means for supervision to be 'appropriate for a child' under the listed factors." *Id.* at 19. Courts consider the statute as a whole "to harmonize [it] and give effect to all its parts." *Id.* (quotation omitted). We address each element individually before considering them as a whole.

### A.     "Provide for"

In *Restorff*, the supreme court concluded that to "provide for" supervision means to "make and execute a plan for supervision." *Id.* The supreme court further stated that "[s]uch a definition contemplates that a parent or childcare provider might directly supervise a child or delegate that task to another individual. In either situation, the caregiver is providing for supervision." *Id.* The supreme court concluded "that Restorff created and executed a plan for supervision" and that under the plan, "Restorff's helper[] supervised 12 children in an unfenced backyard while Restorff was within earshot inside the house." *Id.* at 21.

Here, Haack states that she made a plan for supervision to walk to a grocery store 80 feet across the street to pick up noodles for lunch and to supervise the children directly by bringing a video/audio monitor. She did not completely execute the plan because she returned to the home when she saw the county licensor. The commissioner determined that Haack's "plan" to leave the children alone and unsupervised was inconsistent with a "plan for supervision," and that Haack's deficient plan disposed of the remainder of the *Restorff* analysis. But at this stage, we just analyze whether Haack made and executed a

7

plan, and we do not consider the *Restorff* elements in isolation. We agree with Haack that she made a plan for supervision. Whether that plan and its execution were "appropriate" are analyzed under the third element below.

B.    **"Necessary supervision"**

In *Restorff*, because the MMA did not define "supervision," the ALJ, commissioner, and this court applied the definition of "supervision" from the daycare licensing rules, Minn. R. 9502.0315, subp. 29a (2017), of "a caregiver being within sight or hearing of" a child so they can intervene. 932 N.W.2d at 20. The supreme court rejected its use, and instead applied the dictionary definition of "supervision" to conclude that "supervision . . . requires that caregivers provide for *watchful oversight* of children in their care." *Id.* at 21 (emphasis added).

Here, the commissioner determined that "the existence or non-existence of a baby monitor is irrelevant as it is unacceptable for a provider to rely solely on a monitor as a plan or substitute for direct supervision and to use the monitor to justify an absence from a daycare setting." The commissioner ultimately determined that Haack's reliance on the monitor "from afar while engaged in shopping, was not watchful oversight of the children in her care."

"Watchful oversight" is not a precise term. While the commissioner applied this standard, it appears to have construed "direct supervision" to require a "fully present and engaged care provider with the ability to intervene immediately" and that use of a monitor is a "meager substitute." We disagree with the commissioner's reasoning, as the supreme court in *Restorff* rejected the narrow definition of supervision that required "a caregiver

8

being within sight or hearing of" a child. *Id.* at 19-20. We note that video/audio monitors are commonly used by caregivers, and their use by themselves is not dispositive. Rather, we must analyze whether the supervision was "appropriate" based on all the circumstances.

## C. Supervision that is "appropriate"

In *Restorff*, the supreme court concluded that whether supervision is "appropriate" requires the commissioner to "conduct a fact-specific examination of all of the circumstances present to determine whether the supervision plan was appropriate in the abstract and whether the plan was executed appropriately in the specific context at issue." 932 N.W.2d at 21. The statute requires consideration of "the child's age, mental ability, physical condition, length of absence, or environment, when the child is unable to care for the child's own basic needs or safety, or the basic needs or safety of another child in their care." Minn. Stat. § 260E.03, subd. 15(a)(3). The supreme court highlighted that "the length of the absence" of a caregiver matters, as "[i]t is one thing for a caregiver to step away from her wards for a brief period of time to complete other necessary tasks [but another] entirely to leave children alone for long periods of time with a single young supervisor." 932 N.W.2d at 23.

Here, the commissioner considered the number of children; their young ages; their presumed mental and physical ability; the potential length of Haack's absence; and the child-care home's environment, including safety hazards; before implicitly determining that Haack's "plan of supervision" failed to provide "appropriate" supervision in the abstract and that Haack had committed maltreatment by neglect.

9

We conclude that Haack's supervision plan was not appropriate under the circumstances and that substantial evidence supports the commissioner's determination that Haack committed maltreatment by neglect. Although Haack made and executed a plan for supervision and the use of a monitor may constitute "watchful oversight" or direct supervision in some circumstances, her plan and supervision were not "appropriate" under the particular circumstances present in this case and the "specific context at issue." *Restorff*, 932 N.W.2d at 21. The ten children Haack was caring for included two eight-year-olds, three five-year-olds, a four-year-old, two three-year-olds, a two-year-old, and a 23-month-old. Although the record is silent regarding the abilities of the children, the commissioner reasonably determined that they had "similar mental abilities and physical conditions appropriate for their ages." As noted by the commissioner, but for the county licensor arriving, Haack's absence would have been indeterminately longer, as she had not yet entered the grocery store. Although the children were left in the child-care home, they were left alone, with multiple barriers between them and Haack. The commissioner appropriately considered "whether the supervision plan was appropriate in the abstract," *id.*, and noted that Haack would have had to enter the store, collect the items, pay for them, possibly interact with others, exit the store, cross the main street, and enter her daycare all while supervising the children at the same time. Unlike in *Restorff*, Haack did not have a helper available to supervise the children in person. Further, Haack *did not need* to visit the store, but went only to buy noodles as a spontaneous reward for the children. *Id.* at 23 (noting possibility of caregiver stepping away from children "to complete other *necessary tasks*." (Emphasis added)).

10

Further, the record does not demonstrate that the commissioner's determination was arbitrary or capricious, as the commissioner relied on the statutory definition of neglect and the *Restorff* case in its analysis, considered the totality of the facts, offered an explanation that is supported by the evidence, and did not present an implausible decision. *CARD*, 713 N.W.2d 817 at 832.[2]

We conclude that the commissioner's decision that Haack's supervision plan was not "appropriate" under the circumstances is legally correct, supported by substantial evidence, and was not arbitrary or capricious. As a result, the commission did not err by determining that Haack committed maltreatment by neglect. Although Haack implies that affirming the commissioner's "hardline" decision here would confuse parents and providers regarding the law surrounding maltreatment determinations, we disagree. Our decision in this case is consistent with *Restorff* and the MMA, and the commissioner's ongoing determinations of maltreatment by neglect must be based on fact-specific analyses.

**II.     The commissioner's imposition of a conditional license under the circumstances is supported by substantial evidence.**

Haack argues that, because the record lacks substantial evidence to justify the commissioner's determination that she committed maltreatment by neglect or violated the

---

[2] Haack also cites to *Waters*, 977 N.W.2d 874, to argue that the commissioner erred by adopting the ALJ's findings of fact while reversing its conclusions of law without explanation. But the commissioner did provide an explanation by stating that the ALJ ignored the fact that the short length of Haack's absence was caused by the arrival of the county licensor. Further, the commissioner was unconvinced by the ALJ's interpretation of the MMA and *Restorff*, which is reflected in its final order. Haack's reliance on *Waters* is misplaced here.

11

licensing rules regarding supervision, the commissioner's order that she operate under a conditional license should be rescinded. We are not convinced.

The commissioner may make a license conditional "[i]f the commissioner finds that the . . . license holder has failed to comply with an applicable law or rule and this failure does not imminently endanger the health, safety, or rights of the persons served by the program." Minn. Stat. § 245A.06, subd. 1(a) (2022 & Supp. 2023).[3] The commissioner must "consider the nature, chronicity, or severity of the violation of law or rule and the effect of the violation on the health, safety, or rights of persons served by the program." *Id.*

Although the record reflects that Haack is otherwise a quality child-care provider, based on our analysis above regarding the commissioner's maltreatment determination, we conclude that the commissioner's decision to impose a conditional license is supported by substantial evidence. Besides the maltreatment determination, DHS demonstrated reasonable cause that Haack had violated licensing rules based on the condition of the steps. Further, in determining whether to impose a conditional license, the commissioner considered and adopted the ALJ's findings that the county and DHS's investigation was lacking in some respects, that the record did not support that Haack had repeatedly committed maltreatment, that DHS had only proved one of the many licensing violations it originally alleged, and that Haack had cooperated with the investigation and expressed remorse. As a result, the commissioner rescinded the original revocation of Haack's

---

[3] Although the legislature amended Minn. Stat. § 245A.06, subd. 1 in 2023, the amendment does not impact subdivision 1(a).

license and instead imposed a reasonable, one-year conditional license.  The commissioner adequately explained how it arrived at its determination, which is reasonably supported by the record.

**Affirmed.**